**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVIE LAMAR FIELDS,
　　　　　*Petitioner-Appellant,*

　　　　　v.

JILL BROWN,\* Warden, of
California State Prison at San
Quentin,
　　　　　*Respondent-Appellee.*

No. 00-99005

D.C. No.
CV-92-00465-DT

STEVIE LAMAR FIELDS,
　　　　　*Petitioner-Appellee,*

　　　　　v.

JILL BROWN,\* Warden, of
California State Prison at San
Quentin,
　　　　　*Respondent-Appellant.*

No. 00-99006

D.C. No.
CV-92-00465-DT

OPINION

Appeals from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
June 21, 2005—San Francisco, California

Filed December 8, 2005

*Jill Brown is substituted for her predecessor, Jeanne S. Woodford, as
Warden of California State Prison at San Quentin. *See* Fed. R. App. P.
43(c)(2).

15961

Before: Alex Kozinski, Pamela Ann Rymer, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Rymer

## COUNSEL

David S. Olson, Kulik, Gottesman, Mouton & Siegel, Sherman Oaks, California, for the petitioner-appellant/cross-appellee.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief
Assistant Attorney General; Pamela C. Hamanaka, Senior
Assistant Attorney General; Kristofer Jorstad, Deputy Attor-
ney General; and Keith H. Borjon, Supervising Deputy Attor-
ney General, Los Angeles, California, for the respondent-
appellee/cross-appellant.

---

**OPINION**

RYMER, Circuit Judge:

This case returns to us after remand for an evidentiary hear-
ing to determine whether a juror dishonestly responded to
questions on voir dire and was impartial in light of conversa-
tions that the juror had with his wife during the course of the
trial of Stevie Lamar Fields. *Fields v. Woodford*, 309 F.3d
1095, 1106 (9th Cir.), *amended by* 315 F.3d 1062 (9th Cir.
2002). The district court found that the juror did not intention-
ally mislead the trial court on voir dire, and that the juror had
no discussions with his wife during the trial about its subject
matter that affected his ability to be fair and impartial. As
these findings are not clearly erroneous, and largely control
Fields's claim of ineffective assistance of counsel during the
guilt phase as well, we affirm denial of the writ as to the con-
viction. This requires us now to resolve penalty phase issues
on which we reserved decision. The district court granted a
writ on account of extrinsic material received by the jury, but
we conclude that Fields has failed to show prejudicial consti-
tutional error in this respect or with regard to his counsel's
performance. Accordingly, we reverse this part of the judg-
ment.

I

The details of Fields's "one-man crime wave," which
began fourteen days after he was paroled from prison after

serving a sentence for manslaughter, are described in the opinion of the California Supreme Court on direct appeal, *People v. Fields*, 35 Cal. 3d 329, 336-40, 673 P.2d 680, 683-86 (1983), and our own prior opinion, 309 F.3d at 1098-1100. Suffice it to say here that in September 1978 Fields went on a three-week spree during which he robbed and murdered Rosemary Cobbs, a 26-year-old student librarian at the University of Southern California; robbed Clarence Gessendaner at gun point and took his car and money; kidnaped, robbed, raped, forced the oral copulation of, and assaulted Gwendolyn Barnett; kidnaped and forced the oral copulation of Cynthia Smith; and finally, kidnaped, robbed, raped, and forced the oral copulation of Colleen Coates, an 18-year-old USC student. Fields was convicted of the robbery-murder of Cobbs, with the special circumstance of willful, deliberate, and premeditated murder during the commission of a robbery; the robbery of Gessendaner; the kidnaping for robbery and forced oral copulation of Smith; the kidnaping for robbery and robbery of Barnett, as well as her rape, forcible oral copulation, and assault with a deadly weapon; and the kidnaping, robbery, forcible oral copulation, and rape of Coates. The jury determined that Fields was sane. At the penalty phase, the parties stipulated that all evidence heard in the guilt and sanity phases would carry forward and that Fields had been convicted in 1976 of the voluntary manslaughter of Albert Allen. The state introduced evidence that Fields bludgeoned Allen with a dumbell weight when Allen made homosexual advances. The defense presented no further evidence. The jury fixed the punishment at death under the 1977 death penalty law.

The California Supreme Court affirmed Fields's conviction and sentence on December 29, 1983. *Fields*, 35 Cal. 3d at 336, 673 P.2d at 683. After Fields filed a petition for habeas corpus in the state supreme court claiming ineffective assistance of his trial counsel, Carl Jones, the court appointed a referee to take evidence and make findings of fact on whether Jones was ineffective in failing to conduct an adequate investigation at the guilt and penalty phases. Fields submitted a

number of declarations with his petition, and one of the declarants, Alice Christopher, his maternal aunt, testified at the hearing. He also presented expert testimony by Dr. James Missett, a psychiatrist, and by two attorneys, Gerald Chaleff and Leslie Abramson. The referee found that counsel's guilt phase investigation was adequate, but that his preparation for the penalty phase was not. Applying *Strickland v. Washington*, 466 U.S. 668, 694 (1984), the California Supreme Court concluded that the additional evidence adduced at the hearing did not show a reasonable probability that a more complete penalty investigation and defense would have resulted in a different verdict. It therefore denied the petition. *In re Fields*, 51 Cal. 3d 1063, 800 P.2d 862 (1990).

Fields filed a federal habeas corpus petition on May 25, 1993. The district court stayed proceedings to allow an opportunity to pursue unexhausted claims in state court. Fields filed a second petition for collateral review in the California Supreme Court, which was denied in part on the merits and in part on the procedural ground of untimeliness. When he filed a second amended habeas petition in district court on March 31, 1995, the district court dismissed those claims as procedurally barred. After we reversed, *Fields v. Calderon*, 125 F.3d 757, 759 (9th Cir. 1997), *cert. denied*, 523 U.S. 1132 (1998), the parties filed cross-motions for summary judgment on all claims. The district court upheld Fields's conviction, but granted the petition as to Fields's death sentence. The court ordered the sentence vacated and that Fields be sentenced to life in prison without the possibility of parole unless a new penalty trial were held within 60 days.

Fields and the state both appealed. We affirmed on all guilt phase claims except for the claim of juror bias (and the related claim of ineffective assistance of counsel), on which we remanded for an evidentiary hearing. The juror, Floyd Hilliard, and his wife, Diane Hilliard, testified by way of video-taped deposition, as did two other jurors. The district court found that Hilliard was not dishonest during voir dire, that he

was not actually biased, and that application of the implied bias doctrine in the absence of dishonesty would be a new rule barred by *Teague v. Lane*, 489 U.S. 288 (1989). It also found that the Hilliards had no discussions during trial about the trial that affected his ability to be fair and impartial.

Fields renews his appeal on these issues.

## II

### A

When responding on voir dire to a question whether he had ever been a crime victim or witness, arrested or charged with a crime, or involved in criminal charges or litigation, Hilliard stated that his "wife was assaulted and beaten, robbed, two years ago Christmas" in Los Angeles. The judge noted that some of the charges involved in the Fields case were robberies and asked whether Hilliard thought "it is going to make it difficult for you to be a fair, impartial juror in the case now pending before this court as a result of the experience your wife went through?" Hilliard replied: "I doubt it. I think I'd base it strictly on the charges and the evidence that's presented." Counsel asked no questions and Hilliard was empaneled without challenge.

As it turns out, Hilliard's wife had been accosted at gunpoint by a young African-American male in his early twenties, bound, blindfolded, driven to a secluded area, beaten, raped and robbed. It was a traumatic experience for the Hilliards; the person who attacked her threatened to finish her off, which caused the Hilliards to change the locks on their house and Hilliard to stand guard with a gun for several weeks. Her assailant was not apprehended.

Fields argues that Hilliard's failure to disclose the crimes of rape and kidnap against his wife and to reveal his misgivings about serving as a juror, gives rise to *McDonough*-style

bias[1] on the basis of his untruthfulness in voir dire. Further, he submits that Hilliard was actually biased and that the hearing on remand shows that Hilliard was impliedly or presumptively biased as well.

[1] The Sixth Amendment guarantees a criminal defendant a fair trial, which means, in a case tried to a jury, "a jury capable and willing to decide the case solely on the evidence before it." *McDonough*, 464 U.S. at 554 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)) (internal quotation marks omitted). A defendant is denied the right to an impartial jury if only one juror is biased or prejudiced. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).[2] To obtain a new trial on account of a juror's failure to disclose information during voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. As we explained in *Dyer*, it follows from *McDonough* that "an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." *Dyer*, 151 F.3d at 973 (citing *McDonough*, 464 U.S. at 555-56). Therefore, our task is to determine whether Hilliard's answers were dishonest and whether Hilliard's presence on the jury undermined the jury's impartiality. *See id.* For this purpose we remanded to the district court for an evidentiary hearing.

Having held the hearing that we ordered, the district court found that Hilliard did not respond dishonestly. Considering the entire record, including declarations that Hilliard had signed in 1993 and 1995, as well as his demeanor on the vid-

---

[1] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

[2] In this circuit, "the presence of a biased juror introduces a structural defect not subject to harmless error analysis." *Id.* at 973 n.2.

eotape, the district court found that he did not intend to mislead the trial court when he stated that his wife was "assaulted and beaten, robbed, two years ago Christmas." Whether a juror is dishonest is a question of fact, *see Dyer*, 151 F.3d at 973, and we are not firmly convinced that these findings are clearly erroneous, *see Riley v. Payne*, 352 F.3d 1313, 1317 (9th Cir. 2003).

**[2]** In testimony credited by the district court, Hilliard explained that during voir dire he volunteered that his wife had been assaulted and beaten, intending for people in the courtroom to understand that she had been sexually abused without his having to be explicit about the details. He noted that twenty-five years ago people were not as free and open in talking about sexual assaults as they are today. He did not intend to hide the fact that his wife had been sexually assaulted and if anyone had asked for specifics, Hilliard would have told them. He was mildly surprised when no one sought to strike him, and it would have been fine with him if the judge and attorneys did not want him on the jury. However, Hilliard was prepared to do his duty and serve if selected. If asked, Hilliard would also have said with respect to the charges involving sexual assault that he could be fair and impartial and that he doubted that the attack on his wife would have influenced him. He said he "doubt[ed]" he would have difficulty being fair and impartial only "because you can never be sure what's in the back of your mind." Hilliard stated that he told the truth when he told the judge that he would base his decision strictly on the evidence presented. Hilliard, who like Fields is African-American, did his best to be a fair juror, giving Fields the benefit of the doubt when others were against him, and did not think that the nature of his wife's case, the fact that no arrest had been made, and that her attacker (like Fields) was a young African-American male had any impact on him. He did not confuse Fields with his wife's attacker and did not mention the crimes against his wife to other jurors. To the extent Hilliard may have been mistaken in assuming that being "assaulted" and "beaten," in the con-

text of an assault perpetrated on his wife, would be understood as including a sexual assault, it was an honest mistake for a layperson to make. *See Dennis v. Mitchell*, 354 F.3d 511, 521(6th Cir. 2003) (holding that juror's misunderstanding of a legal term did not denote dishonesty); s*ee also Sanders v. Lamarque*, 357 F.3d 943, 947-48 (9th Cir. 2004) (holding that a juror was not dishonest for failing to disclose that 25 years previously she had lived in an area with gang activity).

**[3]** In these circumstances, paraphrasing *McDonough*, to invalidate the result of a weeks-long trial in state court because of a juror's honest response to a question,

> is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.

464 U.S. at 555. Hilliard was not dishonest in voir dire, and did not fail to give details for any reason that affected his impartiality. Accordingly, we see no basis upon which to invalidate Fields's conviction on account of *McDonough*-style bias.

We have analyzed juror bias under two theories, actual bias and implied bias. Actual bias is " " 'bias in fact"—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.' " *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)). The determination of whether a juror is actually biased is a question of fact, *Dyer*, 151 F.3d at 973, and we are satisfied that Hilliard was not actually biased in light of the district court's

findings. He put aside what happened to his wife and did not confuse it with what he had to decide about Fields. He truthfully represented that he was impartial. And he did not lie to conceal bias. The complete record reveals that Hilliard was a straight-shooter who was in fact a fair and impartial juror.

[4] This leaves Fields's claim that Hilliard was, nevertheless, impliedly or presumptively biased. Fields points out that the standard for implied bias is objective, and that a juror may be found biased even though the juror himself believes or states that he can be impartial. *See, e.g.*, *Gonzalez*, 214 F.3d at 1111-12. Our review is de novo because implied bias is a mixed question of law and fact. *Id.* at 1112. As our last opinion in this case notes, we have previously held that bias may be implied in "those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." 309 F.3d at 1105 (quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (1990) (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988))) (internal quotation marks omitted); *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977) (stating that bias can be implied from the "potential for substantial emotional involvement, adversely affecting impartiality" inherent in certain relationships — there, employment by victim bank). Fields maintains that all the indicia for implied bias are present here because Hilliard and his wife went through a personal experience that is similar to the fact pattern at trial; it is unlikely that a person in his circumstances (whose wife was the victim of a recent unsolved crime by a person whom the defendant resembles and whom the wife suspects could be her attacker) could be impartial; the incident pertaining to Diane Hilliard and Hilliard's subsequent conversations with her during trial present the potential for substantial emotional involvement adversely affecting his impartiality; and Hilliard was not honest during the voir dire process regarding the attack on his wife.

Before going there, however, we must first consider the state's position that Fields's claim of implied bias is barred by the *Teague* rule against retroactive application by a federal court of a new rule of constitutional law. In the state's view, a reasonable interpretation of precedent when Fields's conviction was final would not allow a presumption of bias in the absence of a finding of juror dishonesty. It submits that all but one case in the universe of implied-bias cases that existed as of the date Fields's conviction became final[3] involved dishonesty. *See McDonough*, 464 U.S. at 556*; United States v. Eubanks*, 591 F.2d 513, 516 (9th Cir. 1979); *Tinsley*, 895 F.2d at 527. The one case that did not turn on dishonesty, *Allsup*, 566 F.2d at 71, involved two jurors who were related by employment to the defendant which falls squarely within long-accepted standards for disqualification.

Fields counters that Hilliard's bias may be implied on account of more than just the similarity of the crimes against his wife. For example, extraneous matters such as the conversations that Hilliard had with his wife during trial clearly are not *Teague*-barred because extrinsic information has long since implicated the constitutional right to a fair trial. *See, e.g.*, *Remmer v. United States*, 347 U.S. 227, 229 (1954). He also argues that implied bias based on deficient responses to voir dire questions had been firmly established since no later than *McDonough*, which came down ten years before the California Supreme Court denied his juror bias claim. In addition, Fields points out that the concurring opinions in *McDonough*, and our opinion in *Allsup*, had embraced a standard for implied bias that does not depend solely on dishonesty. *See* 464 U.S. at 556-57 (Blackmun, Stevens and O'Connor, JJ., concurring); *id.* at 558 (Brennan and Marshall, JJ., concurring

---

[3]This date, for *Teague* purposes, is October 9, 1984, the date the U.S. Supreme Court denied certiorari on Fields's direct appeal. *See Fields v. California*, 469 U.S. 892 (1984); *see also Snook v. Wood*, 89 F.3d 605, 612 (9th Cir. 1996) (explaining when a conviction becomes final for *Teague* purposes).

in the judgment);[4] *Allsup*, 566 F.2d at 71-72 (finding implied bias even though juror *disclosed* she worked at a branch of the bank that was robbed).

*Teague* requires us to survey the legal landscape as of the time the petitioner's conviction became final to see whether the rule that he advocates was dictated or compelled by exist-

---

[4]Justice Blackmun's concurrence for Justice Stevens and Justice O'Connor agrees with the Court that

> the proper inquiry in this case is whether the plaintiffs had the benefit of an impartial trier of fact. I also agree that, in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. I therefore join the Court's opinion, but I write separately to state that I understand the Court's holding not to foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

464 U.S. at 556-57 (Blackmun, J., concurring). Justice Blackmun cited to Justice O'Connor's concurring opinion in *Smith v. Phillips*, 455 U.S. 209 (1982), where she suggested that bias may be presumed when, for example, there is "a revelation . . . that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* at 222 (O'Connor, J., concurring).

Justice Brennan's concurrence, in which Justice Marshall joined, agreed with the Court that less-than-complete information during voir dire does not by itself require a new trial, and would hold that "to be awarded a new trial, a litigant should be required to demonstrate that the juror incorrectly responded to a material question on *voir dire*, and that, under the facts and circumstances surrounding the particular case, the juror was biased against the moving litigant." *McDonough*, 464 U.S. at 557-58 (Brennan, J., concurring in the judgment). He would also have recognized that bias may be actual or implied (conclusively presumed as a matter of law), and accordingly, disagreed with the Court "that a new trial is not warranted whenever a prospective juror provides an honest answer to the question posed." *Id.* at 558-59.

ing precedent. *Leavitt v. Arave*, 383 F.3d 809, 816 (9th Cir. 2004) (per curiam). We agree with Fields that the implied bias doctrine existed before 1984; we so held in *Dyer.* 151 F.3d at 984-85. But this does not answer the more discrete issue raised by the state: whether the implied bias doctrine as it existed when Fields's conviction became final would have required a new trial in the absence of dishonesty during voir dire.

On the one hand, the Supreme Court has never held that a juror was impliedly biased in the absence of juror dishonesty. In *Dennis v. United States*, 339 U.S. 162 (1950), the court considered the problem, but refused to find that government employees were impliedly biased and thus automatically disqualified from serving on a jury where the government is a party. *Id.* at 172. Moreover, Justice O'Connor has expressed the view that implied bias should only be presumed in "extreme" or "extraordinary" cases. *See Phillips*, 455 U.S. at 222-23 & n.* (O'Connor, J., concurring); *see also Tinsley*, 895 F.3d at 527 (quoting same). Examples she gave were of "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring). *McDonough*, of course, held that a party must demonstrate that a juror failed honestly to answer a voir dire question that is material to impartiality before a trial result could be invalidated. However, the concurring opinions indicated that they did not understand the opinion to foreclose implied bias in the absence of juror dishonesty on voir dire. In light of these cases we have previously observed that it is an unresolved question whether dishonesty is a necessary predicate to a finding of juror bias. *See Dyer*, 151 F.3d at 979 n.12 (noting it was unnecessary to decide the issue because the juror there had lied during voir dire); *see also Fields*, 309 F.3d at 1105 ("Beyond what these cases indicate, it is an open

question whether dishonesty is required before bias may be found.").

On the other hand, we decided in *Allsup* that bias could be implied in the absence of juror dishonesty. There, two prospective jurors were employed by a different branch of the same bank that the defendant was accused of robbing. We held, on direct appeal, that the defendant's motion to excuse the jurors for cause should have been granted because the bias of those who work for the bank should be presumed. The jurors had honestly disclosed their employment and stated that they could try the case fairly, but we nevertheless presumed bias on account of their employment relationship with the robbed bank and their "reasonable apprehension of violence" from bank robbers. 566 F.2d at 71-72. Given *Allsup*, it is difficult to conclude that it would have been a new rule of constitutional law in 1984 to presume bias despite an honest disclosure of a potentially disqualifying relationship in voir dire.

The state also argues for the narrower proposition that no precedent at the time dictated that an honest juror is impliedly biased simply by virtue of his wife's victim status. While we agree that this is so, we do not require the existence of a case for *Teague* purposes "involving identical facts, circumstances, and legal issues." *Keating v. Hood*, 191 F.3d 1053, 1061 n.11 (9th Cir. 1999), *abrogated on other grounds by Mancuso v. Olivarez*, 292 F.3d 939 (9th Cir. 2002).

*Teague* aside, it is well accepted that bias may be presumed only in "extreme" or "extraordinary" cases. As we emphasized in *Tinsley*, "[p]rudence dictates that courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." 895 F.2d at 527. And, as we also explained, "[i]nstead of formal categorization, the Supreme Court has emphasized the existence of safeguards against actual bias." *Id.* at 527-28.

"In most situations, voir dire, 'the method we have relied on since the beginning,' should suffice to identify juror bias." *Id.* at 528 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). This is because truthful disclosure of information during voir dire sets up a challenge for cause (or in less clear-cut cases, a peremptory challenge) that can be exercised before resources are devoted to trying the case to verdict. Cause challenges lie for implied (or presumed) bias as well as for actual bias. *See Gonzalez*, 214 F.3d at 1111. Honesty is the heart of the jury-selection process in an adversarial system; indeed, "voir dire" means "to speak the truth." The whole point of the voir dire process is to elicit information from the venire that may shed light on bias, prejudice, interest in the outcome, competence, and the like so that counsel and the parties may exercise their judgment about whom to seat and whom to challenge.[5] Accordingly, when the issue of bias arises after trial (as it did in *McDonough* and *Tinsley*) or, as here, on collateral review of a conviction in state court, dishonesty in voir dire is a critical factor. As *McDonough* indicates, "it ill serves the important end of finality" to wipe the slate clean when the potentially disqualifying relationship is disclosed on voir dire examination. 464 U.S. at 555.

Hilliard honestly disclosed that his wife had been a victim of crimes that were quite similar to some of the crimes of which Fields was accused. Although we found implied bias in *Eubanks* based on similarities between the juror's experiences and the events giving rise to the trial, the juror had not been

---

[5]As the Supreme Court elaborated in *McDonough*, voir dire serves to protect the right to an impartial trier of fact — " 'a jury capable and willing to decide the case solely on the evidence before it,' " — "by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." 464 U.S. at 554 (quoting *Phillips*, 455 U.S. at 217).

forthcoming in voir dire about his sons' involvement with heroin. *Cf. Green v. White*, 232 F.3d 671, 676-78 (9th Cir. 2000) (presuming bias biased on pattern of lies); *Dyer*, 151 F.3d at 983 (presuming bias from juror's lies); *Gonzalez*, 241 F.3d at 1114 (holding that cause challenge should have been granted when juror equivocated on voir dire about ability to set aside emotional experience). The implied bias that we found in *Allsup* was based on the jurors' direct relationship with a victim and their own vulnerability to the same type of conduct for which the accused bank robbers were on trial. Hilliard had no personal connection of this sort. He was not related to a participant, victim, or witness. The similarity of experiences was on account of his wife's experience, not his own. Although we have recognized that bias may be implied where close relatives of a juror "have been personally involved in a situation involving a similar fact person," *Tinsley*, 895 F.2d at 528, we have never actually presumed bias from any such relationship when the juror was forthcoming on voir dire.

[5] We need not reach whether dishonesty is required for an implied bias claim because we can see no basis for implying bias as a matter of law solely because Hilliard was the spouse of a rape victim. As a practical matter, many prospective jurors have a close family member or friend with similar experiences. It is the role of voir dire to ferret out such relationships, and to develop the extent to which the juror's ability to be impartial in the particular case is actually, or presumptively, affected. For those revelations that occur during voir dire, the remedy is a cause challenge; for those that occur after trial, the remedy is a post-trial hearing. Here, that hearing showed no actual effect on Hilliard's ability to be fair and impartial. Being the spouse of a rape victim is not, in and of itself, such an "extreme" or "extraordinary" situation that it should automatically disqualify one from serving on a jury in a case that involves rape.[6] It cannot be said that everyone

---

[6]*See United States v. Powell*, 226 F.3d 1181, 1189 (10th Cir. 2002) (holding that juror whose daughter had been raped was not impliedly

in Hilliard's position would necessarily be prejudiced whether he acknowledged it or not. Rather, the effect of the spouse's experience on the juror's impartiality depends on purely personal considerations that can vary from case to case, including, for example, the similarity of the spouse's experience to the facts of the case, the nature of the experience, its contemporaneous and continuing impact, how the individual handles it, and so forth. Given Hilliard's honest voir dire that revealed a potentially disqualifying relationship, but not an extreme or extraordinary one, and the results of the evidentiary hearing which disclosed no actual bias, we see no basis for inferring bias now as a matter of law.

## B

Our conclusion that Hilliard was an impartial juror remains the same whether conversations with his wife during trial are considered together with his voir dire responses, or separately from them.

As shown by the evidentiary hearing on remand, when Diane Hilliard asked her husband about the case, he told her he was not at liberty to discuss it. She knew only that her hus-

---

biased in trial concerning kidnaping for sexual gratification and assault); *cf. Gonzales v. Thomas*, 99 F.3d 978, 989-90 (10th Cir. 1996) (declining to hold that a rape victim can never be an impartial juror in a rape trial as it would "insult not only all rape victims but also our entire jury system, which is built upon the assumption that jurors will honestly try 'to live up to the sanctity of [their] oath.' ") (quoting *Dennis v. United States*, 339 U.S. 162, 171 (1950)). *See also Jones v. Cooper*, 311 F.3d 306, 312-13 (4th Cir. 2002) (refusing to presume bias from the fact that juror's relatives had been arrested and tried); *Torres v. United States*, 128 F.3d 38, 46 (2d Cir. 1997) (declining to hold that bias must be implied where juror has engaged in conduct similar to that of the defendant at trial). *But see Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992) (holding that burglary of sequestered jurors that occurred during their deliberations concerning a similar burglary charge was an extreme situation justifying presumption of bias).

band was a juror on a case involving a young, African-American male who had abducted and shot someone. She did not know if Fields's case involved rape charges. From what she knew Mrs. Hilliard thought it was a possibility that Fields might be the man who assaulted her; she told her husband this, and said that she would like to go to court to see if he were. Hilliard thought his wife was a little paranoid, told her he doubted Fields was the man who attacked her (Hilliard testified that it never crossed his mind that Fields was the person who assaulted his wife), and refused to let her come to the trial because he did not want her to compromise the trial or him as a juror, and did not want her to go through any psychological problems or trauma as a result of seeing the trial. The district court found that Hilliard never confused the crimes against his wife with those that Fields committed, and he obeyed the trial judge's instruction not to discuss the case until it was over. Further, Hilliard truthfully told the judge he would decide the case on the evidence and the law given at trial, and nothing else, and "absolutely" did so. Finally, the district court found that the discussions did not delve deeply, if at all, into the facts of Fields's case and that Hilliard's discussions with his wife did not affect his ability to be fair and impartial. Accordingly, it concluded that Fields's claim under *Remmer v. United States*, lacked merit. *See Remmer*, 347 U.S. 229.

We agree. Fields argues that the fact that Hilliard knew his wife seriously entertained the notion that Fields might have been her assailant (regardless of his own views of the matter) made it impossible for him to exercise independent judgment. Thus, in his view, the conversations gave rise to a presumption of prejudice that was not rebutted. Fields also urges that Hilliard evinced an "excess of zeal" to stay on the jury, thereby manifesting a lack of impartiality. However, these arguments fail in light of the district court's findings, which are supported in the record. The court found Hilliard credible, which means that he did not discuss the Fields trial beyond saying what kind of case it was, he did not buy his wife's

speculation about Fields's being her assailant, he did not con-
fuse the Fields case with the crimes against his wife, and
nothing discussed with his wife affected his ability to be fair
and impartial.

It is Hilliard's impartiality that matters, not his wife's. We
agree with the district court's conclusion that to the extent the
Hilliards had discussions relating to the case, they were harm-
less, as the conversations did not affect Mr. Hilliard's ability
to be fair and impartial.

## III

In a related claim, Fields maintains that his counsel was
ineffective in failing to question Hilliard during voir dire
about the attack on his wife or about his ability to serve
impartially. To prevail under *Strickland v. Washington*, 466
U.S. 668 (1984), Fields must show that his "counsel's perfor-
mance was deficient" and "that the deficient performance
prejudiced the defense." *Id.* at 687. As we observed in our
prior opinion, "it is tough to imagine why [Jones] did not pur-
sue what kind of assault Hilliard's wife suffered, given that
the non-capital charges against Fields included rape." *Fields*,
309 F.3d at 1108. The state hypothesizes tactical reasons why
Jones would have wanted Hilliard on the jury, but whether
counsel had a strategic reason or not is immaterial, for Fields
was not prejudiced. *Strickland*, 466 U.S. at 697 (observing
that a court may determine prejudice without first deciding
deficiency). Prejudice exists if "there is a reasonable probabil-
ity that, but for counsel's unprofessional errors, the result of
the proceeding would have been different." *Id.* at 694. Here
there is no such reasonable probability, because Hilliard was
not biased. The impartiality of the jury was not undermined
by his being seated as a juror. Replacement of an unbiased
juror with another unbiased juror should not alter the out-
come.

[6] As we have previously addressed all other claims hav-
ing to do with the guilt phase, and we now resolve the juror

bias issues in favor of the state, we affirm the judgment entered on Fields's conviction.

## IV

Fields contends that his counsel also rendered ineffective assistance at the penalty phase in two respects: first, because he failed to investigate, obtain, and present mitigating evidence, especially about Fields's background that was marked by domestic violence, abuse, and poverty; and second, because he failed to investigate and present potential psychiatric evidence based on the adverse conditions of Fields's childhood and possible organic brain impairment. On account of this failure, Fields submits that the court-appointed psychiatrists did not have a complete picture of his emotional and mental deficits when evaluating him.

## A

The facts are fully set out in the California Supreme Court's opinion on Fields's habeas petition, *In re Fields*, 51 Cal. 3d at 1071-74, 1076, 800 P.2d at 866-70, but in summary:

Carl Jones was appointed to represent Fields. Although Jones was an experienced criminal defense attorney, this was his first capital case. Prior to trial, the court appointed two psychiatrists, Drs. Franklin Drucker and Ronald Markman, to examine Fields. Drucker was unable to complete his examination as Fields refused to be interviewed; Markman submitted an expert report in which he opined that Fields had an "antisocial personality," was unable to conform his conduct to legal requirements, and was therefore legally insane. Fields's counsel also obtained the psychiatric evaluation prepared by Dr. Tommy Bolger for the California Adult Authority at the time Fields was convicted of manslaughter.

After counsel added a plea of not guilty by reason of insanity, the court appointed two additional psychiatrists to evaluate Fields. Drs. Donald Trockman and Saul Faerstein agreed with Dr. Markman's diagnosis of antisocial personality disorder, but concluded that Fields was not insane because he was capable of conforming his behavior to legal requirements. At the sanity phase, Markman opined that Fields suffered from antisocial personality disorder and that he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. This met the definition of insanity under the American Law Institute test then in use in California. However, Markman testified on cross-examination that if "mental disease or defect" under a subsection of the ALI test does not include an abnormality manifested only by repeated antisocial conduct, Fields would not be insane. Faerstein and Trockman both said that Fields had an antisocial personality disorder but was capable of conforming to legal requirements. The jury found that Fields was sane.[7]

The penalty phase began a few days later. The parties stipulated that Fields was previously convicted of the voluntary manslaughter of Albert Allen. The prosecutor's opening statement consisted of four sentences advising the jury about Fields's prior manslaughter conviction and of his release from prison 15 days before the Cobb murder; Fields's counsel made no opening statement. The prosecution called one witness, Joseph Freia, who was the investigating officer in the Allen manslaughter case. Freia testified that Fields admitted to killing Allen by striking him in the head with a dumbbell weight numerous times after Allen made a homosexual advance. Freia also identified a photograph of Allen's body taken shortly after the killing as well as a dumbbell that he

---

[7]The California Supreme Court approved the trial judge's instruction that mental disease or defect does not include antisocial conduct, and upheld the jury's finding on appeal. *Fields*, 35 Cal. 3d at 368-72, 673 P.2d at 705-08.

testified was similar in size and shape to the one Fields used on Allen. The defense put on no witnesses.

The prosecutor gave a brief closing argument that reviewed the evidence on aggravating factors, and maintained that the jury should not accept a defense plea for mercy as no other circumstances extenuated the gravity of Fields's ruthlessly smashing Barnett's head, putting Smith through a night of terror, driving Coates to jump out of a second-story window to escape his wrath, bashing Albert Allen's head, and taking Cobb's life while she was crying out for God. Jones's closing argument focused on the theme that Fields had no supportive family or friends. He argued that there was lingering doubt about the Cobb murder; that Fields was a young man who used PCP when he was released from prison and was under its influence; that Dr. Markman was of the opinion Fields was insane and suffering from a psychiatric disorder; that Fields was a man who the testimony of various doctors indicated had never known his father, that his mother was never there, and that his sister struck a deal to testify against him; and that revenge, which is what the prosecutor wants, can be had by life without the possibility of parole instead of by killing Fields. The jury returned a verdict of death.

The California Supreme Court affirmed on direct appeal and after the United States Supreme Court denied Fields's petition for certiorari, he filed a petition for habeas corpus with the California Supreme Court raising both ineffective assistance claims. The petition appended declarations by several family members and friends of the family indicating that Fields's father was an alcoholic who beat him when he was a child; that Fields had a terrible skin rash when he was young; that Fields's mother paid no attention to him; that Fields was always picked on as a child until he started fighting for himself; and that Fields was molested by an uncle when he and his brother were staying with the uncle in Texas. The California Supreme Court appointed the Honorable George Dell, retired judge of the Los Angeles Superior Court,

as referee to take evidence and make findings of fact on the question: "Was defendant's conviction or death sentence unconstitutionally obtained in that defendant was deprived of his right to effective assistance of counsel by counsel's failure to conduct an investigation adequate to permit the selection, preparation and presentation of evidence at the guilt and penalty trials?" *In re Fields*, 51 Cal. 3d at 1068, 800 P.2d at 864.

At the hearing (held in June 1987), Dr. James Missett, a psychiatrist, testified that Fields's medical records, psychiatric evaluations, statements by significant persons in his life, and school records warranted further investigation and provided a factual basis for a "monumentally different" image of Fields from that presented by the prosecution. He noted that interviews of family members suggested the possibility that Fields had experienced a seizure at the age of nine when he lost consciousness after his father, who had been known to beat him in the past, struck him in the head. Missett also believed that blood loss and head trauma from a stabbing incident may have aggravated a pre-existing brain disorder. According to Missett, establishing organic brain impairment would significantly mitigate the special circumstance of robbery-murder and explain why Fields acted in a manner that appeared to be cold, callous, and calculating.

In rebuttal, Dr. Faerstein testified that it remained his opinion that Fields had no significant organic brain disorder even after reviewing the Markman, Missett, and Trockman reports; Dr. Missett's oral testimony; Fields's school records; and a Buffalo social worker's family assessment report.

Fields's aunt, Alice Christopher, testified at the hearing. She lived with the Fields family for six months in Buffalo, New York, when Fields was two, and in the neighborhood until he moved to California in 1973 at the age of 15. She said that the Fields family was characterized by verbal abuse, domestic violence, emotional neglect and intoxication. Christopher testified that Fields suffered from a severe body rash

that caused him to bleed and cry out in pain from the ages of two to six; that he was a slow learner who was subjected to ridicule; and that he was a sensitive child who loved and protected his mother but had a difficult childhood. At age nine he began to steal to please his mother, and both parents accepted the proceeds. Christopher also indicated that Fields had psychological treatment around the age of twelve, and had been in a boy's home for stealing.

Gerald Chaleff, a criminal law specialist, expressed the opinion that Jones had failed adequately to investigate Fields's personal and psychological history. Leslie Abramson, also experienced in the defense of capital cases, likewise described the kind of investigation that she believed should have been undertaken, but was not. In her view, this would have included interviewing Fields's family and friends in Buffalo; investigating his psychiatric history in Buffalo, prior juvenile convictions, drug use, and possible organic brain damage which would have described Fields more sympathetically than "antisocial personality"; contacting a social worker about the negative effect that Fields's parents had on him; developing the theme that Fields's parents exploited and physically abused him; investigating positive aspects of Fields's personality as a small child, and the rash; obtaining his school records to show sluggish development; and investigating Fields's sexual victimization by a male relative.

Jones testified that he had interviewed Fields's mother and some family members in Los Angeles. The interviews related primarily to issues of guilt. He decided not to call Fields's mother or sister in the penalty phase because both had accepted money or property from Fields that they knew he had stolen, and his mother had shown up at his preliminary hearing wearing a blouse belonging to one of the victims. Other members of Fields's immediate family were also implicated in his criminal activities. Jones considered calling Fields's father, but Fields told him that they had had no contact since early childhood. Although in hindsight he would

have gone to Buffalo and interviewed family and friends who knew Fields as a child, Jones testified that he would nevertheless not have used information thereby adduced for the habeas petition, or called the declarants at trial, because it would have been ineffective and would have defeated the point he was trying to make — that Fields didn't have anybody to guide or support him — which he believed was the best argument available.

The referee found that counsel's investigation into Fields's mental health, while not as extensive as it might have been, was adequate to meet minimum standards because the psychiatric experts were in agreement that Fields suffered from an antisocial personality. The California Supreme Court agreed that counsel's actions in this respect constituted a reasonable and consistent trial strategy. However, the referee found that Fields did establish that the procedures used to investigate penalty phase evidence in mitigation fell below minimum standards. This latter finding was based on Jones's failure to interview relatives who were not involved in Fields's criminal activities, to conduct any investigation in Buffalo, and to put on any witnesses during the penalty phase. The referee made findings only on the deficiency prong, not on the prejudice prong, although evidence was received on this point at the hearing. Based on that evidence, which was substantially undisputed, the California Supreme Court concluded that it was not necessary to determine whether Jones's failure to investigate further was a reasonable tactical choice, because Fields failed to prove prejudice under the *Strickland* standard.

The state supreme court found that Fields was not prejudiced for three basic reasons. First, this was one of the most aggravated murder-with-special- circumstance cases to come before the court. *In re Fields*, 51 Cal. 3d at 1079, 800 P.2d at 872. Fields had already been convicted of one killing before he embarked on his "one-man crime wave" immediately after being released from prison. He kidnaped the murder victim and took her to his house where witnesses saw her, naked and

bound, in Fields's bedroom. He forced her to write a check for the balance in her checkbook then shot and killed her. He stole a car at gunpoint, kidnaped two prostitutes, raped both of them and severely beat one of them, breaking her jaw with the handle of a gun in the process. Fields then kidnaped another woman, stole her car, took her to his house, raped her, and tried to get money from her checking account. Thus, the evidence showed a pattern of criminal behavior that included a murder and at least three kidnapings, rapes, and robberies within a three-week period of time. Second, Fields's proof at the reference hearing was limited to Christopher's testimony and experts who relied on out-of-court declarations that were untested by cross-examination and were of questionable truthfulness. The declarations themselves were not offered into evidence. Hence, the showing of what the penalty phase would have been like with adequate investigation was not strong enough to overcome the aggravating evidence. And third, evidence of Fields's history, background and mental condition came in at the sanity phase and so the jury already knew much of the information that would normally not be introduced until the penalty phase. As it was, the evidence showed a mentally disturbed person who used drugs, lacked parental support and guidance, and whose mother and sister were both implicated in his crimes. The additional evidence would have shored up this picture, but in light of the evidence that was actually before the jury, the state supreme court reasonably did not find that the additional evidence that might have been discovered would have altered the outcome.

The district court presumed the state supreme court's findings of fact after the evidentiary hearing to be correct pursuant to 28 U.S.C. § 2254(d) (1966).[8] It noted that the aggravating

---

[8]Another series of declarations were filed after the reference hearing. The declarations were made between April 1993 and January 1994; they were appended to Fields's second (exhaustion) petition filed in the California Supreme Court. They provide substantially the same information as the declarations submitted in connection with Fields's original habeas

evidence was extensive and powerful, whereas the mitigating evidence presented by Fields at the state evidentiary hearing was not particularly compelling in light of the aggravating evidence. The district court agreed with the California Supreme Court's holding and itself found no reasonable probability that the jury would have concluded that the balance of the aggravating and mitigating evidence did not warrant the death penalty if Jones had presented the evidence that Fields contends should have been presented. It also agreed with the supreme court that Jones's representation was not constitutionally infirm because he made reasonable strategic decisions about mental health evidence in light of the law at the time; the district court additionally held that Fields failed to establish prejudice because even if an expert could have been found to testify that Fields suffered from organic brain damage, the evidence presented at the hearing was not persuasive and would have been rebutted by the three experts who actually testified.

B

Fields faults both the California Supreme Court and the district court for "dodging" the issue of counsel's deficient performance, but both quite properly determined the issue of prejudice first. As *Strickland* instructs, "a court need not determine whether counsel's performance was deficient before examining the . . . result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697. Beyond this, he contends that prejudice was patent because no

petition in the supreme court, albeit in somewhat greater detail and from additional sources. Like the initial series, the 1993/1994 declarations were not part of the record at the state evidentiary hearing. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7-10 (1992). Fields has never argued that any of the circumstances set out in 28 U.S.C. § 2254(d)(1)-(8) (1966) are present.

mitigating evidence was proffered, which left the jury with no choice but to impose the death penalty; it enabled the prosecutor to argue that "[p]lain and simple, there are [no mitigating factors]";[9] and specific mitigation evidence has a substantial impact on jurors.

[7] We are not persuaded that the trial which Fields supposes should have occurred would have produced a different outcome. In short, we agree with the analysis of the California Supreme Court and the district court. While Fields's childhood as described by Christopher was undoubtedly grim, the jury already knew something of his background, what his mother and sister were like, and that he had psychological and emotional difficulties. It is not reasonably probable that Christopher's description of the skin rash that Fields suffered from age two until he was six, or his father's alcoholism and verbal abuse against the children, the domestic violence Fields witnessed, the filthy house in which he grew up, his poverty, or parental neglect — deplorable though all are — would outweigh one of the most aggravated crime sprees in the memory of the California Supreme Court.[10] *Cf. Stankewitz v. Wood-*

---

[9]The prosecutor stated:

> Finally, any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime? Plain and simple, there are none. When the defendant comes up here through his counsel and asks you for mercy, think of the mercy that he gave to Gwendolyn Barnett, whose head he so ruthlessly smashed; and Cynthia Smith, who he put through a night of terror; Colleen Coates, who was willing to jump out of a second-story window to escape the defendant's wrath; to Albert Allen, whose head was brutally smashed and bashed by the defendant; and, yes, to Rosemary Cobb, who, in crying out for her God, defendant took the life, shooting her numerous times at contact range and beating her head, who lived for ten to fifteen minutes after that.

[10]Christopher's testimony would not have been entirely sympathetic, as she also testified that Fields had been in juvenile court once or twice, was put into a boys' home for stealing at the age of 11 or 12, had robbed a tavern when he was 15 and was involved in at least one fight, when he was 16, during which he was stabbed in the neck.

*ford*, 365 F.3d 706, 718, 723 (9th Cir. 2004) (holding deficiency was prejudicial when evidence would have shown that Stankewitz was severely beaten by his mother as a child, was sexually molested while under the care of the state, was unable to use eating utensils or engage in rudimentary social graces, and would wet his bed and smear feces on the wall of his bedroom upon leaving the state's care as a child, and suffered organic brain damage); *Mayfield v. Woodford*, 270 F.3d 915, 929-32 (9th Cir. 2001) (en banc) (holding deficient performance was prejudicial in light of testimony at evidentiary hearing indicating witnesses would have testified at trial regarding Mayfield's childhood diabetes and associated hardships, diagnoses of childhood depression, drug use and exacerbation drugs would have had on existing psychological ailments, and positive things Mayfield did in his life).

[8] Fields's position in a nutshell is that the fact "that the aggravating evidence was 'extensive and powerful' . . . only demonstrates that counsel's failures were so prejudicial." We understand his point, that powerful aggravating evidence calls for powerful mitigating evidence, but this simply restates the deficiency inquiry. It begs the prejudice question of whether the evidence that *could* have been adduced with proper investigation (that is, if counsel had not been deficient) *would*, if presented at trial, have been persuasive enough to outweigh the aggravating evidence. When, as here, the aggravating evidence is powerful, the mitigating evidence that would have been produced at trial following a proper investigation must be sufficiently compelling to undermine confidence in the outcome. *See Boyde v. Brown*, 404 F.3d 1159, 1179 (9th Cir.) ("Our prejudice inquiry must focus on whether the result would have been different in light of the evidence that would have been presented to the jury had [the petitioner's] counsel not been deficient."), *amended by* 421 F.3d 1154 (9th Cir. 2005). It was to determine what the new mix would look like that the evidentiary hearing was ordered by the California Supreme Court.[11] Based on the record that was produced in

---

[11]As the state supreme court explained:

   In a habeas corpus petition alleging incompetent investigation or

that hearing, the state supreme court concluded that Fields failed to establish prejudice on account of counsel's failure to investigate his childhood adequately. We cannot conclude otherwise.

**[9]** Nor can we disagree with the state supreme court's determination that counsel's performance was not deficient with respect to investigating Fields's mental condition. Three psychiatrists agreed that he had an antisocial personality disorder. Fields's experts were well-qualified, and neither suggested to counsel that further examination or expert consultation was necessary. *Cf. Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."). Fields's argument that adequate investigation would have yielded more accurate information is well taken in the abstract, but again, falls short in light of the facts reliably found in the evidentiary hearing. While Chaleff and Dr. Missett testified at the evidentiary hearing that interviews Jones failed to conduct raised the *possibility* of a "passive dependent" personality and some organic brain impairment, the state supreme court found that this would have been dis-

---

presentation of evidence by trial counsel, a petitioner generally cannot expect to establish a case for relief solely by relying on testimony, expert or otherwise, describing what evidence might have been discovered and produced by competent counsel. Instead, he must generally produce that evidence so the credibility of the witnesses can be tested by cross-examination. (If the prosecution claims it could have refuted that testimony by rebuttal evidence, it may also have to produce the witnesses to prove its claim.) In effect, the petitioner must show us what the trial would have been like, had he been competently represented, so we can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different.

*In re Fields*, 51 Cal. 3d at 1071, 800 P.2d at 866.

puted by experts relying on Fields's criminal record to support a diagnosis of antisocial personality. Further, Dr. Trockman conducted a Bender-Gestalt test for organic brain disease before trial and informed Jones that the test did not demonstrate the existence of any such disease. Although Missett opined that the test should be redone, Jones cannot be faulted for accepting Trockman's opinion. *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."); *see also Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2004) (holding counsel's decision not to investigate mental defense further was reasonable in light of conclusions of mental health experts). Finally, Dr. Faerstein testified at the hearing that he saw no reason to change his opinion, expressed at trial, that Fields did not suffer from organic brain damage. That he and Dr. Missett disagree does not mean that trial counsel was deficient.

V

Finally, Fields claims prosecutorial misconduct arising from the prosecutor's statement during the penalty phase closing argument that the jury should think of the mercy Fields showed his victims, and that the death penalty was appropriate in light of the Allen homicide. We disagree. Attorneys are given wide latitude during closing arguments. *See United States v. Vaccaro*, 816 F.2d 443, 451 (9th Cir. 1987), *abrogated on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988)). The prosecutor's argument was based on evidence the jury could properly consider as aggravating under California law and the instructions. *See* Cal. Penal Code § 190.3(a) (instructing that jurors should consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding"); *id.* § 190.3(b) (instructing jurors to consider prior violent criminal acts committed by the defendant).

## VI

The state cross-appeals the district court's decision to grant relief on Fields's claim of juror misconduct based on the jury's use of Biblical quotations and dictionary definitions. It presses four reasons for error: the claim is not timely under Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts; it is *Teague*-barred; the district court's finding was based on juror declarations that are inadmissible under Federal Rule of Evidence 606(b); and the jury's consideration of the Biblical passages and dictionary definitions did not violate the Constitution or have a substantial and injurious effect on the verdict.

The penalty phase of Fields's trial commenced on July 16, 1979, lasted less than a day, and the jury deliberated from 2 p.m. until 4 p.m. without reaching a verdict. That evening, Rodney White, the foreperson of the jury, checked the Bible and other reference texts and made notes "for" and "against" imposition of the death penalty which he brought to the deliberations the next day.[12] White also consulted a dictionary for

---

[12]The "for" side notes:

- "placate gods"
- "eye for eye"
- "deterrence"
- "Fitting punishment to crime"
- "Rights of victim"
- "Duty of the state to protect citizens"
- "Biblical
    "Genesis 9:6 'Whoso sheddeth man's blood by man shall his blood be shed, for in the image of God made He man'
    "Exodus 21:12 'He that smiteth a man, so that he dies, shall surely be 'put to death' "
- "Possibility of Repeated offenses"
- "Murder = a rejection of the values of society"

definitions of the words "extenuation," "vindication," and "mitigate," and brought these notes to the jury room as well.[13]

---

- *"New Test*

  "Romans 13:1-5 'Let everyone be subject to the higher authorities, for there exists no authority except from God, and those who exist have been appointed by God. Therefore, he who resists the authority, resists the ordinance of God; and they that resist bring on themselves condemnation

  'For rulers are a terror not to the good work but to the evil. Dost thou wish, then, not to fear the authority?

  'Do what is good and thou will have praise from it. For it is God['s] minister to thee for good. But if thou dost what is evil, fear, for not without reason does it carry the sword. For it is God's minister, an avenger to execute wrath *on* him who does evil. Wherefore you must needs be subject, not only because of the wrath, but also for conscience's sake.' "

- "Luther, Calvin, Aquinas felt this to be supportive of capital punishment" and

- "Per Paul's letter to Romans: State has power for two reasons — 1. Satisfy demand's [sic] of God's service [and] 2. Protect society by deterring future crime."

The "against" side notes:

- "No real deterrent value—mostly because murderers not normal"

- "Question of 'Just'—There is no simple, 'just,' penalty"

- "Discriminatory selection"

- "Human fallibility—Perhaps wrong chap convicted."

- "Rehabilitation"

- " 'Popular' feelings"

[13]The notes were:

Extenuation - *to thin out* - palliation, softening, whitewash, gloss over, varnish, loophole, make allowance for

Vindication - justifiable, excusable, inculpable, blameless, legitimate not blameworthy . . . vindicable/extenuating

The notes were shared or the information was received by at least some jurors when deliberations resumed at 9:30 a.m. on July 17th. By 3 p.m. that afternoon, the jury had reached its verdict.

Fields first raised the issue of juror misconduct in his federal petition. He presented a number of juror declarations that the district court ultimately struck to the extent that the information contained in them was inadmissible under Rule 606(b).[14] Juror testimony about consideration of extrinsic evidence may be considered by a reviewing court, but juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not. *See, e.g., Sassounian v. Roe*, 230 F.3d 1097, 1108-09 (9th Cir. 2000). However,

---

"The proper object of extenuate in its sense of making excuses for is a word expressing something bad in itself, as guilt, cowardice, cruelty — *not* a neutral word such as conduct or behavior - circumstances [sic]

"The meaning of excuse should *not* attach to *extenuate*, the word." VA [sic] Fowler

Mitigate - soft, smooth, gentle, mild. *abate*, lessen, allay, attenuate, weaken, reduce, render or cause to be less, less harsh[,] decrease, diminish, decrease, curtail quality, limit, narrow, assuage.

[14]Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter of statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

based on what was left, the court found that the religious
material in White's notes was actually received by the jury,
was available to it on the second day of deliberations, was dis-
cussed by some jurors, was presented at an early stage of
deliberations, and directly related to a material aspect of the
case. *See Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995)
(identifying the factors to consider in determining whether
jury exposure to facts not in evidence deprives a defendant of
his Sixth Amendment rights to confrontation, cross-
examination and assistance of counsel as "(1) whether the
extrinsic material was actually received, and if so, how; (2)
the length of time it was available to the jury; (3) the extent
to which the jury discussed and considered it; (4) whether the
material was introduced before a verdict was reached, and if
so, at what point in the deliberations it was introduced; and
(5) any other matters which may bear on the issue of . . .
whether the introduction of extrinsic material [substantially
and injuriously] affected the verdict" (alterations in original)
(quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir.
1986))).[15] The district court concluded that the jury's consid-
eration of Biblical references offended the principle that reli-
gion may not play a role in the sentencing process, and that
it had the potential to be highly prejudicial.

---

[15]Other facts we have considered that might suggest that the potential
prejudice of extrinsic information is diminished in a particular case
include

> [1] whether the prejudicial statement was ambiguously phrased;
> [2] whether the extraneous information was otherwise admissible
> or merely cumulative of other evidence adduced at trial; [3]
> whether a curative instruction was given or some other step taken
> to ameliorate the prejudice; [4] the trial context; and [5] whether
> the statement was insufficiently prejudicial given the issues and
> evidence in the case.

*Sassounian*, 230 F.3d at 1109 (alterations in original) (quoting *Jeffries v.
Wood*, 114 F.3d 1484, 1491-92 (9th Cir. 1997) (footnotes omitted)) (inter-
nal quotation marks omitted).

Before considering anything else, we must first decide the *Teague* issue. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (instructing that if a state argues that the district court granted a habeas petition on the basis of a new rule of constitutional law that is *Teague*-barred, a court must address the *Teague* issue first); *Leavitt*, 383 F.3d at 816 (same). The state's position is that as of the time Fields's sentence became final, law binding on state courts allowed jurors to exercise " 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty [under the state statute].' " *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)). The state also points out that as of then, it was established law that a capital jury "express[es] the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 US. 510, 519 (1968). While these propositions are no doubt so, it is also true that as of 1984 it was well established "in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *See Mattox v. United States*, 146 U.S. 140, 149 (1892). The district court's ruling cannot be *Teague*-barred at this level of generality.

**[10]** In addition, the Sixth Amendment inquiry is fact-specific. It requires a reviewing court to determine whether the particular materials that a juror brought into the jury room are extraneous materials, or are merely "the kind of common knowledge which most jurors are presumed to possess." *Rodriguez v. Marshall*, 125 F.3d 739, 745 (9th Cir. 1997), *overruled on other grounds*, *Payton v. Woodford*, 299 F.3d 815, 828-29 & n.11 (9th Cir. 2002) (en banc); *United States v. Bagnariol*, 665 F.2d 877, 888 (9th Cir. 1981) (discounting claim of prejudice where extraneous information was something "any reasonable juror already knew"). Although the state maintains that Fields must cite authority binding on California courts at the time his sentence became final which held that it was a constitutional violation to bring Bible quotations

and dictionary definitions into the jury room during penalty-phase deliberations, we have been unwilling for *Teague* purposes to require a case "involving identical facts, circumstances, and legal issues." *Keating*, 191 F.3d at 1061 n.11.

**[11]** Turning, then, to the merits, we disagree with the district court's assumption that the Biblical references are extrinsic, factual material. It did not explicitly decide whether the Bible verses in White's notes were common knowledge or extrinsic facts. Certainly Biblical verses are not the sort of material that should have been made part of the record. But Bible verses nevertheless are common knowledge in the sense that they are part of the pool of information that many people possess. While some verses may be more familiar than others, White's "for" references all expound on the well-known themes of "an eye for an eye" and "he who lives by the sword, shall die by the sword." Fields nowhere suggests that White was not free to recite these verses or resort to their reasoning in support of whatever position he took. *See McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir. 1997) (holding juror declaration about the conduct of deliberations inadmissible under Rule 606(b) and noting that "[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room." (quoting *Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989))); *Burlington*, 870 F.2d at 1462 (denying new trial where one juror used personal knowledge of x-ray interpretation to sway others because "[i]t is expected that jurors will bring their life experiences to bear on the facts of the case"). Sharing notes is not constitutionally infirm if sharing memory isn't. Jurors may be screened for bias but otherwise should not be expected to leave their life experiences and general knowledge behind.

**[12]** To the extent that White's notes are extrinsic or improper, however, cases where we have found that extrinsic material had a substantial and injurious effect on a verdict are

of a different order of magnitude.**[16]** We have found prejudice when, for example, the jury discussed an extra-record telephone call that directly related to the defendant's motive, *Sassounian*, 230 F.3d at 1110; when a juror told others about the defendant's reputation for violence, *Lawson*, 60 F.3d at 612-13; and when the jury learned that the defendant had committed a prior armed robbery, *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993). White's Bible verses are not of this sort; they are not, in fact, facts at all. As Justice Stevens put it, "While the question of innocence or guilt of the offense is essentially a question of fact, the choice between life imprisonment and capital punishment is both a question of underlying fact and a matter of reasoned moral judgment." *Sawyer v. Whitley*, 505 U.S. 333, 370 (1992) (Stevens, J., concurring in the judgment).

**[13]** At the same time, as Fields correctly points out, we have held that it is improper and prejudicial for the *prosecution* to invoke God or to paraphrase a Biblical passage in closing argument in the penalty phase of a capital case. *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000). However, the prosecutor is constrained in ways that a juror is not. As we explained in *Sandoval*, there the prosecutor's argument frustrated the purpose of the closing argument, which is to review the evidence presented at trial that is relevant to the jury's decision as defined by the instructions given by the court. *Id*. Also, the prosecution's invocation of "higher law" or extrajudicial authority violated the Eighth Amendment principle of narrowly channeled sentencing discretion. *Id*. Further, we noted that argument involving religious authority undercuts the jury's own sense of responsibility for imposing the death penalty. *Id*. at 777. None of these considerations applies in similar fashion to a juror; what may be improper or prejudi-

---

**[16]***See Sassounian*, 230 F.3d at 1108 (adopting the standard of review for harmless error of *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), for unconstitutional juror misconduct).

cial when said by a prosecutor may not be so when said by a juror.

[14] Whether or not White should have brought his notes to the jury room and shared them, we cannot say that the Biblical part of the "for" part of the notes had a substantial and injurious effect on the verdict. His own notes had an "against" part as well. So far as we can tell the communication occurred early on in deliberations. There was plenty of time for jurors to sort through the evidence and to reflect on whether the ultimate penalty was the right penalty. The aggravating evidence is powerful, as all judges to review it have remarked. Although closing argument for the defense might have been more persuasive if backed up by more details in the evidence, it nevertheless made a forceful case for mitigation on account of Fields's youth, lack of familial support and guidance, insanity, drug use, and lingering doubt. Nothing in the record indicates that the jurors did not follow the instructions on the law as given by the trial judge. Accordingly, we see no constitutional error that requires the writ to be granted on account of the juror's references to scripture.[17]

[15] Dictionary definitions for terms used in the instructions directly implicate the law given by the court by which the jury's decision must be determined. If a jury needs help with the instructions, the proper thing to do is ask the judge. However, whether or not it was misconduct to research these definitions, and for the jury to review them, we cannot say that the jury's consideration of the definitions on White's notes had a substantial and injurious effect or influence in determining the verdict in this case. Fields has shown no influence whatsoever, and none is apparent to us. Accordingly, the misconduct is harmless.

---

[17]For this reason we do not reach the state's remaining arguments for reversal.

## VII

We hold that Fields was not deprived of an impartial jury and therefore the district court's judgment on his conviction is affirmed. Even assuming that trial counsel was deficient in preparing for the penalty phase by not interviewing friends and family in Fields's hometown, Fields was nevertheless not deprived of the effective assistance of counsel in violation of the Sixth Amendment because there is no reasonable likelihood that the mitigating evidence that could have been produced at trial would have outweighed the aggravating evidence of a crime spree involving three kidnapings, three rapes, four robberies, and one murder within a couple of weeks of release from prison for another homicide. Counsel was not deficient and neither was Fields prejudiced by the investigation into his mental condition. To this extent we also affirm the district court's judgment. However, we conclude that juror misconduct, if it occurred, had no substantial or injurious effect on the verdict. To this extent, the district court's judgment is reversed. In sum, we see no prejudicial error, nor any cumulative error, requiring the writ to issue.

AFFIRMED IN PART; REVERSED IN PART.