Filed 9/5/13  In re Anderson CA2/3
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re | B232746 |
| WILLIAM FRENCH ANDERSON, | (Los Angeles County Super. Ct. No. BA255257) |
| on | |
| Habeas Corpus. | |

ORIGINAL PROCEEDINGS in habeas corpus.  Michael E. Pastor, Judge. Order to show cause discharged; petition for writ of habeas corpus denied.

Douglas W. Otto for Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Respondent.

_____

This opinion follows our July 12, 2013, order granting Anderson's petition for rehearing and effectively vacating our prior opinion in this matter (*In re Anderson on Habeas Corpus* (June 17, 2013, B232746) [nonpub. opn.]; Cal. Rules of Court, rule 8.268(d)). We vacated our original opinion in order to address Anderson's contentions and provide the People an opportunity to file an answer. Having done so, we now refile the same opinion we filed previously with the sole addition of a new footnote number 8 on page 25.

Petitioner William French Anderson was the appellant in *People v. Anderson* (2012) 208 Cal.App.4th 851, which affirmed the judgment entered following his conviction by jury of continuous sexual abuse of a child under the age of 14 years and three counts of lewd act with a child under the age of 14 years. (Pen. Code, §§ 288.5, 288, subd. (a).) In addition to the appeal from the judgment, Anderson filed this writ petition to raise ineffective assistance of counsel issues. After ordering the petition and the appeal to be considered concurrently, we severed the matters to prevent further delay of the appeal. We now consider Anderson's claim counsel rendered ineffective assistance in failing to challenge the admissibility of a secretly recorded conversation in which the victim confronted Anderson and requested an apology for his years of abuse. We issued an order to show cause. Upon review of the evidence in the record and before us by declaration, we conclude an evidentiary hearing is unnecessary, deny the petition and discharge the order to show cause.

## SUMMARY

From *Anderson*: "Anderson, a medical doctor and the founder and director of a genetic research laboratory, sexually molested the daughter of an employee of the laboratory from the time the child was in the fourth or fifth grade until the ninth grade. Anderson coached the victim in competitive karate; she won national karate competitions when she was in the fourth and fifth grades in 1997 and 1998. He also assisted her academically. However, they frequently were alone together and he regularly committed lewd acts upon her. The victim's testimony was generic in that she testified generally

2

about a continuing course of misconduct. E-mails Anderson sent her after the abuse ended but before she decided to report him in April of 2004 corroborated her testimony. Because Anderson indicated in his e-mails he would apologize to her in person, she agreed to meet him outside a public library while carrying a recording device provided by detectives. On July 1, 2004, she surreptitiously recorded a conversation in which she angrily confronted Anderson and asked why he had molested her. At trial, Anderson claimed the apologies in his e-mails were for applying excessive pressure on her to succeed and at the library she was on the verge of going out of control and he was willing to say whatever was necessary to calm her." (*People v. Anderson, supra,* 208 Cal.App.4th at p. 856.)

On appeal, Anderson claimed the trial court erroneously excluded evidence of his conduct after the library confrontation, particularly, that he and his wife wrote a four-page letter dated July 4, 2004, to Anderson's friend, San Marino Police Chief Arl Farris, in which they reported the victim falsely had accused Anderson of sexual molestation in November of 2003 and expressed their fear she had descended into drug abuse and might try to extort money from them. We found no reversible error in the exclusion of this evidence as hearsay and under Evidence Code section 352. We also rejected Anderson's claim that application of these rules of evidence infringed upon his constitutional right to testify in his own behalf. Moreover, any error was harmless as Anderson testified fully with respect to all aspects of the case, including the e-mails and the recorded conversation. We found evidence related to Anderson's conduct after the library confrontation was not critical to his defense and admission of the evidence would not have altered the outcome of the case. We also rejected Anderson's claim the prosecutor unfairly exploited the exclusion of Anderson's post conversation conduct in argument to the jury.

Anderson now contends defense counsel rendered ineffective assistance in failing to challenge the admissibility of the recorded conversation on authentication grounds (Evid. Code, §§ 1400-1402), in failing to protect Anderson's right to testify fully and credibly regarding the library confrontation, and in failing to investigate indicia of

3

alteration of the recording.[1] He claims defense counsel should have known the recording was incomplete or had been edited because there is a time disparity of two or three minutes between the 12-minute recording of the conversation and the lead detective's case log, which indicates the library meeting consumed approximately 14 minutes. Also, the conversation starts awkwardly and Anderson told defense counsel the recording did not include the initial portion of the conversation in which the victim, Y., accused him of sexual molestation and he denied it. Anderson further claims proper investigation by defense counsel would have discovered anomalies in the recorded conversation that were found by Anderson's habeas experts. Anderson claims prejudice, asserting proper investigation and an objection on authentication grounds would have, at minimum, caused the jury to question the recording and the credibility of law enforcement.

The success of Anderson's petition depends in great measure on his post-conviction declaration in which he claims the recording of the library confrontation does not include the first few minutes of the conversation in which Y. accused him of sexual molestation and he denied it. Habeas counsel commenced oral argument with an extensive quote from Anderson's declaration. However, Anderson's claim is inconsistent with Anderson's statements to the police in which he insisted the meeting lasted only three minutes and denied that Y. accused him of molestation during the meeting. Also, Anderson testified extensively at trial but never mentioned this assertedly missing conversation. We conclude Anderson's claim of extensive unrecorded conversation is not credible.

Anderson's further claim defense counsel should have subjected the recording to an authentication challenge based on various indicia of untrustworthiness, such as the time disparity, the awkward start of the conversation and anomalies uncovered by his

---

[1] Anderson also contends defense counsel should have objected to the prosecutor's improper exploitation of the trial court's exclusion of Anderson's post conversation conduct. However, Anderson's claim of prosecutorial misconduct on this same ground was rejected on appeal. Therefore, Anderson's related claim of ineffective assistance of counsel also fails. (See *People v. Collins* (2010) 49 Cal.4th 175, 204-205.)

4

habeas experts, is also unavailing.  None of the findings by the habeas experts or otherwise indicates the defense would have prevailed on an authentication challenge. Y. testified before the grand jury and at trial the recording accurately reflected her conversation with Anderson.  This testimony alone would have been sufficient to authenticate the recording.  However, additional support for the admission of the recording is found in the testimony of the deputy sheriff responsible for transferring the digital file from the recording device.

Because it is clear Anderson's primary claim is not credible, and nothing in the asserted indicia of untrustworthiness suggests the recording of the library confrontation would have been excluded from evidence or substantially denigrated in the eyes of the jury, Anderson is unable to demonstrate that any of the actions he now asserts should have been undertaken would have resulted in a more favorable outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694 [80 L.Ed.2d 674].)  We therefore reject his claim of ineffective assistance of counsel, conclude no evidentiary hearing is required, deny the petition and discharge the order to show cause.

## FACTS AND PROCEDURAL BACKGROUND[2]

1.  *The "time disparity."*

Entries in Detective Ron Jester's case journal for the day of the library confrontation indicate Anderson arrived at the library at 1:25 p.m. and Y. walked into the library after the conversation ended at 1:39 p.m.  The actual recorded conversation is 11 minutes and 48 seconds long.

2.  *Anderson's written and recorded statements*.

In the letter to Chief Farris dated July 4, 2004, Anderson stated the conversation lasted approximately three minutes and began with Y. saying, "You ruined my life."

---

[2]     We incorporate by reference the Facts and Procedural Background as well as the Discussion related to the admissibility of the letter to Chief Farris in *People v. Anderson, supra*, 208 Cal.App.4th at pp. 858-875.  We take judicial notice of the record on appeal in *People v. Anderson* as well as the superior court file.

5

On July 9, 2004, in a recorded interview, Anderson told Detectives Duncan and Boyett the conversation lasted approximately three minutes and Y.'s first words were, "You ruined my life." Before the grand jury, Boyett testified that, during this interview, he asked Anderson whether, during the meeting at the library, Y. mentioned "abusing her, molesting her, touching her, anything like that" and Anderson responded, "No. No, that never came out."

On July 30, 2004, Anderson told Detective Jester the library meeting was "real brief" and estimated it lasted three minutes. When asked to recount the conversation, Anderson said he came from behind and "said, 'Hi, [Y.].' And she turned around with this look of hate and said, 'You ruined my life.' " Anderson said he did not respond to that accusation. When told the meeting was not three minutes long, Anderson stated, "Yes, it was." Before the grand jury, Jester testified the meeting lasted "about 15 minutes."

3. *Anderson's declaration.*

In a declaration filed in support of his habeas petition, Anderson asserts that, upon his release from custody on August 2, 2004, he received a copy of the "purported transcript of the July 1, 2004 recording" and "immediately noticed" it "omitted the first part of the conversation . . . ." Anderson declared: "I wrote out in longhand my best recollection of the omitted part of the conversation . . . . At the point where she showed me the cuts on her arms, I became very upset and concerned, and the rest of the missing portion is the closest I could remember:

"A: Hi, [Y.]!

"Y: You ruined my life!

"A: [Y.]?

"Y: Why did you molest me?

"A: Oh, [Y.], not again. You know I didn't.

"Y: But you did ruin my life.

"A: [Y.], we've been through this and you know I'm sorry. I thought you were better.

6

"Y:  No, I'm worse. Look at my arm! [shows fresh cuts on her arms]

"A:  Oh my heavens.

"Y:  You did this!  You kept pushing me and I begged you to stop.  I don't want to go to Harvard.  I don't want to be a scientist.  I don't want to be your protégée.  Why didn't you stop when I asked?

"A:  I'm sorry. I'm sorry.  I'm sorry.  (Long pause)

[I am not certain of the exact order of each exchange from here on; also I may have forgotten some exchanges]

"Y:  That doesn't help.  I'm flunking all my classes.  I'm flunking all my classes.  It's your fault.  You're just evil.  (Pause)

"A:  I'm so sorry.  I feel so guilty.  I know I was wrong.  What can I do to help?

"Y:  Make things better.  (Long pause)  I've tried to kill myself.

"A:  Oh, my God, [Y.]!  (Long pause)

"Y:  Why did you do it?  Why did you do it?

"A:  I'm so sorry.  I was just evil.  (Pause)

"Y:  Why?  Why?

"A:  Like I said in my e mails:  I was just horribly horribly thoughtless.  I thought I was making you more successful.  Oh, [Y.], I just feel terrible.  Just awful.  I can't comprehend why I was so thoughtless.  (Pause)

"Y:  You started pushing me in 5th grade.  5th Grade!

"A:  I made you a 2-time National Champion.

"Y:  But you couldn't leave it at that.  You wanted me to be the National Champion every year!  That's why I quit.  Can't you get that through your fucking head?  That's why I quit!

"A:  I'm so sorry.  What can I say?  (Long pause)"

At this point, the recorded conversation begins.[3]

Anderson faxed his description of the omitted conversation to his attorney, Barry Tarlow, and shortly thereafter met with Tarlow to discuss the case.[4] Tarlow told Anderson he had shredded the document and explained "he did not want to be wedded to facts at the beginning of the case . . . ." Anderson declared that, during this meeting, he told Tarlow what had been omitted from the transcript and that parts of the transcript differed from his recollection.

In preparation for trial, Tarlow told Anderson not to testify the beginning of the conversation was missing from the recording in order to avoid cross-examination on this point. Tarlow said it would hurt Anderson's credibility to claim the recording was incomplete without independent proof the recording had been edited. Also, Tarlow told Anderson he would ask whether Anderson knew the reason for Y.'s professed problems with relationships, referenced during the recorded conversation. Tarlow hoped the prosecutor would follow up, thereby permitting Anderson to testify he had information indicating Y. was gay, which the trial court had ruled inadmissible. Had Tarlow asked, Anderson would have testified Y. took a girl to the prom and was evasive about it. Also, Y. assertedly had an "odd relationship" with her best friend and seemed unusually anxious to please her.

Anderson declared Tarlow never discussed with him the feasibility of a challenge to the recorded conversation on authentication grounds or based on the time disparity.

---

[3] The recording of the library confrontation commences:
"Y: Hey?
"A: (Inaudible)
"Y: So?
"A: Can we go somewhere?
"Y: Why?
"A: Because I think I'm going to break down (INAUDIBLE) . . . [¶] . . ."

[4] Anderson was represented at trial by Barry Tarlow, Blair Berk and Saura Sahu.

8

4.  *Litigation with respect to the library confrontation.*

On August 22, 2005, Hon. Terri Schwartz ordered the prosecution to produce the original recording of the library confrontation and the police interviews of Anderson conducted on July 9 and July 30, 2004, and the equipment used to make them for examination by the defense expert in the presence of a representative of the agency in possession of the equipment, subject to the prosecutor's indication the agency would claim the official information privilege under Evidence Code section 1040.

On November 29, 2005, the defense filed numerous pretrial motions, two of which are relevant here. One motion addressed the procedure governing the assertion of the official information privilege and requested sanctions, including dismissal. The other motion sought sanctions for the delay in complying with the order of August 22, 2005. Both motions relied on a declaration of defense expert John Russ filed December 7, 2005, under seal.

Russ, a fiber-optic engineer and an expert with respect to "recording analysis and enhancement," declared proper analysis of the recordings at issue required "access to the real equipment and/or software, as well as the identity, the specifications (including serial numbers, brand names and instruction manuals), the inspection and repair records, and/or other similar information about some or all of (1) the microphones and containers housing or concealing them when they were used; (2) any broadcasting devices; (3) all cables and connections used; (4) possibly some or all component(s) of the recording devices; and/or (5) all the equipment and/or software used to process or store the recording after it was reduced to an original format."

Russ declared analysis of the recordings required "an audio expert to search for and document subtle cues of evidentiary manipulation, as where the recording party intends for the device to be capable of inaccurate or incomplete transmissions. Digital media are more easily manipulable, and the manipulation is more difficult to detect, than tape media. . . ." "[A]ccess to the original data is necessary to determine what, if any, manipulation has occurred and whether the device was intentionally set up to be capable

9

of inaccurate or incomplete transmissions." Russ opined "the microphone was not well suited to the transmission and recording equipment."

In January of 2006, the People provided the defense a letter identifying the recording equipment used to make the recordings. A memo from Attila Mathe, the president of Adaptive Digital Systems ("ADS"), the manufacturer of the recording device, is attached to the letter. The memo states recorded data is transferred from the device to a write once CD or DVD and "write once" media is used to "add credibility to the archived evidence."

On February 16, 2006, the matter was transferred to Department 100 for trial and thereafter was assigned to Hon. Michael Pastor.

At a pretrial hearing on March 23, 2006, the prosecution provided the defense disks of the original unenhanced recordings of the library conversation and the police interviews of Anderson. At the hearing, defense counsel stated the disks were copies and there was a dispute "about what the originals are" because "[t]he originals have been taped over and don't exist."

Jury trial commenced on June 14, 2006.

On June 27, 2006, the defense filed a motion seeking a ruling on the claim of the official information privilege and whether sanctions should be imposed for its assertion. The trial court conducted a hearing on the motion at which Sheriff's Detective Kurt Ebert of the Southern California High Technology Task Force testified the microphone is imbedded in the recorder and the device records "directly to flash memory inside" the device and "the only way to get information out is to transfer it from the recorder to a computer, and from the computer you subsequently copy those files to some archivable permanent media you mark as evidence and make other copies or give to the investigator or further enhance." Ebert explained the original recording is in the manufacturer's proprietary format and it is transferred to a computer with the manufacturer's proprietary software. Ebert indicated the transfer is accomplished "with a pretty decent level of verification. This thing was designed . . . for the FBI." The original recording in proprietary format is converted to a .wav file, "which is Windows standard format," so it

10

can then be enhanced. Ebert took screen shots of the enhancement process to allow anyone to duplicate the process but did not take a screen shot of the conversion of the recording from the proprietary format to a .wav file. The original version of the recording, the enhanced version and the screen shots were put on a CD that was provided to the defense.

Regarding the privilege, Ebert testified, "the way [the device] works, and the processes it does, and features it has, we feel [it] need[s] to be kept out of the realm of the public. And the manufacturer, to my understanding, has federal mandates against the stuff being released outside of law enforcement and the military."

The trial court conducted a further hearing in camera and sustained the claim of privilege with respect to "the equipment itself, any proprietary processes regarding this equipment as to its functionality and the specific features of the equipment, manuals describing the features, and any attached or built-in devices . . . ."

The defense thereafter requested an instruction advising the jury the prosecution had refused to disclose information about the equipment used to record the conversation and the jury should therefore disregard the recording. The defense argued it had been deprived of a "meaningful attack" on the recording, citing Russ's previously filed declaration, and claimed it had nothing with which to compare the enhanced version of the recording. The trial court denied the request, ruling disclosure of the official information was immaterial within the provisions of Evidence Code section 1042 and would not "raise[] a reasonable possibility of exoneration."

In a letter from Russ to defense counsel Sahu dated July 14, 2006, the same day as the trial court's ruling on the claim of privilege, Russ indicated the recordings he had been provided appear to be normal but he needed to compare them to the originals in order to detect any alterations or edits.

5. *Tarlow's letter to habeas counsel.* (*Exhibit B to the petition.*)

In letters dated August 19, 2009, October 12, 2010, and November 29, 2010, habeas counsel asked Tarlow to address the "time disparity" and Anderson's claim substantial conversation was missing from the recording. The letter of August 19, 2009,

11

enclosed "a draft declaration confirming that [the failure to attack the recording based on the time disparity] was an oversight on [Tarlow's] part . . . ." In the subsequent letters, habeas counsel inquired whether Tarlow had considered "any other potential challenges to the admissibility/reliability" of the recorded conversation.

Tarlow responded in a letter dated December 30, 2010, exhibit B to the habeas petition. In the letter, Tarlow stated he could not sign the declaration enclosed with the August 19, 2009 correspondence "because it was not accurate." Regarding the time disparity, Tarlow noted "Jester's estimate that the 'duration' of the library meeting was about 15 minutes does not determine the length of the actual conversation or support a claim that 3 minutes of conversation is missing." Also, raising the issue of the time disparity had negative implications for Anderson as he had been "recorded insisting that the conversation/meeting was 3 minutes long."

Regarding the assertedly omitted conversation, Tarlow agreed Anderson "repeatedly" claimed the conversation started with Y. saying, " 'you ruined my life,' and that it was not on the recording." Anderson also "may well have claimed to me at times that there was a small amount of additional conversation also missing." However, Tarlow denied Anderson ever claimed "there were 3 minutes of missing conversation or 2 minutes." Tarlow indicated "[Anderson] was discussing a missing portion of seconds with me not 3 minutes."

Regarding "any other potential challenges" to the recording of the library confrontation, Tarlow wrote: "I certainly recall that I considered attacking the admissibility/reliability of the library tape recordings. [W]e . . . thoroughly reviewed and analyzed all of the issues involving potential Secondary Evidence, Best Evidence, and Authentication, objections to the admissibility of the library recording."

Tarlow noted the defense raised authentication and secondary evidence issues with respect to documents in Y.'s computer and stated: "I determined that the best available approach was the one we followed . . . . We [sought] access to all of the necessary original recordings, manuals and microphones, as well as the computers involved in the enhancement process and the production process. Without these materials we could not

12

move forward to persuasively assert Constitutional or Evidentiary objections or demonstrate the recordings had been manipulated."

6. *Other relevant declarations.*

In exhibit A to the petition, defense expert Russ declared that, after contracting with Tarlow, he interacted exclusively with associate counsel Sahu. Russ stated he "emphasized" to Sahu the defense had not been provided original recording data and without that data, "reliable authentication of the CDs was virtually impossible." Russ stated the procedure recommended by ADS, i.e., transfer to a write once CD, "is a reliable means of producing an accurate surrogate or proxy for the original digital data. However, . . . in the Anderson case . . . the original data was transferred from the recorder to the computer used by the law enforcement agent assigned to the case." Russ declared that, once the original data had been deleted from the recording device, "the recorder could provide no assistance in determining the authenticity of the CD copies provided by the prosecution." Russ also claimed he "suggested" Sahu "consider having the CDs examined by another expert with more specialized background in digital recording issues."

In exhibit S to the petition, habeas counsel asserts a thorough search of "defense counsel's files and billing records" revealed "no indication of any research, memoranda or other work product reflecting consideration of Evidence Code section 1400, et seq."

Exhibit H to the petition is a declaration from habeas counsel indicating that on December 20, 2010, Sergeant Powell of the Sheriff's Technical Crew stated he was aware the manufacturer of the recording device recommended transfer of digitally recorded data to a write once CD but, as a matter of internal policy, the Sheriff's Department transferred data from the recorder to a computer and did not make a screen shot of the transfer.

7. *Declarations re indicia of alteration of the recorded conversation.*

In support of the petition, Anderson submitted declarations of four experts.

Yi Xu, Ph.D., an associate professor at University College London who specialized in "speech prosody," declared he found anomalies in the library recording

13

which are incompatible with the limitations of human vocalization. At 52:59 of the recording, just prior to the phrase "Why did you molest me?", Xu found four male vocal pulses with a total duration of 29.3 milliseconds. However, a human utterance requires a minimum of 46 milliseconds. Xu opined, "[t]his brief vocalization is most likely the beginning of a longer utterance that has been foreshortened through some mechanical means during the processing of the recording."

At 53:07 of the recording, between the end of the phrase, "Why did you molest me?" and the beginning of the next phrase, Xu found the pitch of the female voice rises 150 Hz in 189.05 milliseconds, which exceeds the capacity of an untrained voice. The "brevity of the rise time makes it unlikely these utterances were spoken one after another, as currently found on the recording."

At 54:47 of the recording, Xu found a pause of 62.9 milliseconds between two female utterances, which is too short to be a normal pause, and concluded these "utterances were therefore unlikely to have been spoken as they appear on the recording."

Xu indicated each anomaly "casts serious doubt as to the authenticity of the recording of the conversation," and "[w]hen viewed cumulatively, they constitute strong evidence that the recording, as currently constituted, was altered from the original conversation by some mechanical or digital means."

In a supplemental declaration, Xu asserted the pitch levels of Anderson's first six utterances are below normal levels for social conversation and fall in the pitch range indicating sadness. Thus, Anderson's first utterances likely were "made *after* . . . some conversation that induced the sad emotional tenor . . . ."

Curtis Crowe, assertedly an expert in the analysis of digital recordings, found an electronic spike at 45:05 of the recording, approximately two seconds after a female voice says, "Hey," in a low tone. This spike "appears to contain two distinct impulses of differing timing characteristics." The sound and shape of the impulse "is consistent with what we may see after a digital edit."

At 46:12.8, a male voice is cut off abruptly in a manner "consistent with a recorder dropout or editing." A similar abrupt termination occurs at 46:21.6, of the recording.

14

Finally, Crowe detected a 58.3 Hz signal, which is not normally associated with an outdoor environment. The signal begins prior to the first word of the conversation and stops almost exactly at the end of the conversation. Crowe could find no potential source of this signal at or near where the conversation occurred.

Craig Schick, B.S., an electronics engineer, also detected the 58.3 Hz signal which commenced shortly before the start of the conversation. None of the comparison recordings Schick made outside the library included a 58.3 Hz signal. Schick concluded the recording had been edited in an environment that allowed the introduction of a 58.3 Hz signal, like a laboratory or office, and asserted with certainty the recording had been "adulterated."

In a second declaration submitted with the traverse, Crowe indicated he analyzed the sound of footfalls at the start of the recording and compared them to the sound of Y.'s footfalls as she walked from the scene of the conversation, at first on grass and then on concrete. Crowe concluded the footfalls at the start of the conversation "appear to be made on a hard or concrete surface," not on the grassy surface where the conversation occurred. Also, the sound of Y.'s footfalls as she walked from the conversation are distinctly different and consistent with the grassy surface where the conversation occurred. "These anomalies, taken together, provide a stronger basis for inference that the recording has been altered."

Catalin Grigoras, Ph.D., found three "counter" anomalies that indicate audio data is missing from the recording. A two second jump occurs at 12:41:57. Four second jumps occur at 13:04:53 and at 13:28:21, the latter occurring during conversation. Grigoras hypothesized the missing data could be caused by recording system malfunction, human intervention to delete data blocks or "an audio signal played back through the microphone input that can be followed by human intervention on the file structure to edit data blocks." Grigoras declared: "Any intentional alteration that would not be detected as a counter skip anomaly would likely necessitate a two-step process of (a) editing the content of the recording while in WAV format, and then (b) re-recording the edited version onto the recorder initially used. . . . [I]n order to determine the

15

feasibility of an intentional alteration, I need to examine the recorder used to make the recording in this case."

Finally, in the traverse, habeas counsel notes the recording of the library conversation provided to the defense in December of 2010 bears a time stamp that coincides with the observations of the surveilling deputies. However, a time stamp in the "Properties" file of the same recording indicates the first file was transferred from the recorder to a computer at 2:23 p.m. However, Detective Jester's case journal indicates he did not deliver the recorder to the Sheriff's Technical Operations Office until 2:55 p.m.

8. *Declarations submitted with the return.*

In exhibit No. 2 to the return, Detective Jester declared the entries in his journal reflect the time Jester received information, not the time the event occurred. Also, 1:25 p.m. indicates when Anderson arrived at the library, not when he began speaking to Y. The 1:39 p.m. entry indicates when Jester was informed Y. had walked into the library and was safe. Also, Jester records time without regard to seconds. Thus, 1:25 p.m. could reflect a real time of either 1:25:05 or 1:25:55.

In exhibit No. 3 to the return, Detective Ebert declared: "Generally, when transferring a recording from a recorder made by Adaptive Digital Systems ('ADS'), I would transfer the recording to a computer. This was done using proprietary software from ADS, and the resultant file was in a proprietary format. I would then make at least two exact CD copies of the recording in the proprietary format. One CD was archived, and the other was given to the investigator on the case." "The recording in this proprietary format could only be played using the proprietary software, or converted to a .wav file. It could not be edited, altered, or manipulated in any way. The recording in this proprietary format was therefore protected."

"I generally transferred recordings from the ADS recorder to a computer instead of to a write-once CD for two main reasons. First, it saved time because it was time-consuming to transfer to a CD, and if there was an error, the entire process would have to be repeated. Second, we usually needed multiple copies of a recording, and it was easier and more reliable to make a CD from the computer than from another CD." After Ebert

16

had "two good copies" of a recording in the proprietary format, the recording would be erased so the recorder could be used again.

Ebert declared: "The transfer process from the recorder to the computer was an automatic process. I would click a button that said 'Transfer,' and . . . proprietary software would then transfer the recording in its own format. . . . There was no way to alter, manipulate, or edit the file during this process." "Conversion from the proprietary format to a .wav file was also an automatic process using the proprietary software. . . . There was no way to alter, manipulate, or edit the file during this process. However, once a file was in a .wav format, it was unprotected and could be easily edited or enhanced by anyone who had it." "In the thousands of recordings that I have worked on, I never altered, manipulated, or edited any file without documenting it, as described above . . . ."

In exhibit No. 4 to the return, Sheriff's Sergeant John Powell declared: "The original recording of the library conversation between Anderson and the victim was provided to the defense in its proprietary format." Further, in February of 2011, Powell received a telephone call from Attila Mathe, the president of ADS, referring to a letter Mathe had received from habeas counsel. The letter advised Mathe that habeas counsel had "the recording in its proprietary format, and was able to play that recording using the proprietary software, USB Bird Player . . . ." However, habeas counsel "identified two separate places in the proprietary version of the recording where the time skipped about three seconds: 13:04:53 and 13:28:22. He requested that ADS attempt to restore the missing data."

After Powell verified habeas counsel's observations, he sent Mathe the recording device and asked "him to have someone look at the original data files to see if there was a clock error or something else. . . . In response, Mr. Mathe wrote the letter that is attached to the Petition as exhibit O."

Exhibit O to the petition, an undated and unaddressed letter from Mathe, indicates: "Blocks of the recording corresponding to the two missing approximately 3 second sections contained zeros instead of audio data." A diagnostic routine revealed two "bad

17

memory blocks" in the recorder which correspond with the segments of the recording that contained zeros. Mathe concluded the two missing segments were the result of "memory block failure. . . . During the examination we did not find any evidence of data tampering."

## CONTENTIONS

Anderson contends defense counsel rendered ineffective assistance in failing to challenge the admissibility of the recording of the library confrontation on authentication grounds, in failing to protect Anderson's right to testify fully and credibly regarding the library confrontation, and in failing to investigate indicia of alteration of the recording of the library confrontation. In the traverse, Anderson insists an evidentiary hearing is necessary to resolve numerous factual matters.[5]

## DISCUSSION

1. *Anderson's claim of approximately two or three minutes of unrecorded conversation is entirely incredible.*

Anderson declares he advised Tarlow before their first meeting there was an extended unrecorded conversation at the outset of the library confrontation in which Y. accused him of sexual molestation and he denied it. Anderson claims this missing conversation was critical to the jury's understanding of his explanation of the recorded portion of the conversation. Anderson argues defense counsel rendered ineffective assistance in failing to elicit Anderson's version of the conversation to allow Anderson to testify to "his own version of events in his own words." (*Rock v. Arkansas* (1987) 483 U.S. 44, 52 [97 L.Ed.2d 37].) Instead, during preparation for trial, defense counsel told Anderson not to question the authenticity of the recording. Anderson asserts his claim the recording did not include a portion of the conversation is supported by the time disparity as well as the absence of normal social salutations at the start of the

---

[5] Anderson has not presented a declaration from any of the three attorneys who represented him at trial. Tarlow's letter to habeas counsel, exhibit B, is not submitted under penalty of perjury. However, as relevant to the resolution of Anderson's writ petition, the matters set forth in Tarlow's letter are apparently based on the record.

18

conversation and the tenor of the initial exchange which suggests something not currently contained in the recording caused Anderson to say he feared a break down.

"A petition for a writ of habeas corpus is a collateral attack on a presumptively final judgment; therefore, 'the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them' [citation]." (*In re Crew* (2011) 52 Cal.4th 126, 149.) Anderson has failed to carry this burden.

Anderson's claim that two or three minutes of conversation are missing from the recording is inconsistent with his prior statements found in the record. In the letter to Chief Ferris and in the interviews of Anderson conducted on July 9 and July 30, 2004, Anderson said the conversation was brief, lasting only a few minutes. He did not state on any of these three occasions that Y. accused him of molestation at the outset of the conversation and he denied it. In the interview conducted by Detectives Boyett and Duncan on July 9, 2004, Anderson *denied* that Y. mentioned molestation during the library confrontation.

Also, Anderson testified at length at trial and was questioned, line by line, about the library confrontation. He did not testify the conversation started with Y.'s accusation of sexual molestation and his denial. His claim that, on advice of counsel, he failed to mention substantial unrecorded conversation that supported his position is not worthy of belief.[6]

The time disparity does not support Anderson's claim of substantial unrecorded conversation. Detective Jester explained in his declaration he recorded the time events

---

[6] Anderson's lack of credibility in this regard likely informed the decision to file the instant writ petition in this court, rather than the trial court. We note that, after the People requested dismissal of Anderson's petition for failure to state his CDC number, place of incarceration and "the circumstances justifying an application to this court," rather than the trial court (Cal. Rules of Court, rule 8.384(a)(1); Form MC-275, p. 6), Anderson provided his CDC number and place of incarceration but did not state the circumstances justifying application to this court in the first instance. The failure to address this point, in our view, speaks to Anderson's desire to avoid further litigation before Judge Pastor, who found Anderson's trial testimony incredible and so advised Anderson's supporters at sentencing.

were reported to him, not the time the events occurred, and he disregarded seconds when he recorded the relevant times. Also, the 1:25 p.m. entry reflects the time Anderson arrived at the library, not the start of the conversation, and the 1:39 entry indicates when Y. entered the library at the end of the conversation. Thus, the 14-minute duration of the meeting as reflected in Jester's case journal is consistent with a 12-minute recorded conversation.

With respect to Anderson's argument the conversation begins awkwardly and nothing on the recording explains why Anderson feared a breakdown at the outset, this was not a normal social encounter. Anderson and Y. had not met face-to-face in approximately one year and, in the interim, Y. had written e-mails to Anderson advising him of the distress occasioned by his abuse, her struggle with whether to report him and her insistence that Anderson participate in therapy. Given the circumstances, it is not surprising that the conversation begins in a disjointed and emotional manner.

Thus, we reject as incredible Anderson's claim there was extended unrecorded conversation at the outset of the library confrontation in which Y. specifically accused him of sexual molestation and he denied it. Tarlow cannot be faulted for failing to elicit Anderson's testimony in this regard and referral of the matter for an evidentiary hearing to determine the truth of Anderson's assertion would constitute an idle act.

2. *No ineffective assistance with respect to the failure to object to the recording of the library confrontation on authentication grounds.*

a. *Authentication.*

Evidence Code sections 1400 and 1401 require a writing to be authenticated before the writing or secondary evidence of its content may be received in evidence.[7] A "writing" includes an audio recording. (§ 250.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other

---

[7]     Subsequent unspecified statutory references are to the Evidence Code.

20

means provided by law." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187, citing section 1400.)

Authentication is a preliminary fact first determined by the trial court subject to redetermination by the jury. (*People v. Marshall* (1996) 13 Cal.4th 799, 832; *People v. Fonville* (1973) 35 Cal.App.3d 693, 708-709.) The proponent of the writing has the burden of establishing its authenticity. The proponent's threshold burden "is *not* to establish validity or negate falsity in a categorical fashion, but rather to make a showing on which the trier of fact reasonably could conclude the proffered writing is authentic." (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1437.)

The proponent's burden is met "when sufficient evidence has been produced to sustain a finding that the document is what it purports to be [citation]." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) "This foundation is usually provided by the testimony of a person who was present at the time the picture was taken, or who is otherwise qualified to state that the representation is accurate." (*People v. Bowley* (1963) 59 Cal.2d 855, 862.)

When sufficient evidence of authenticity is provided, "[t]he trial court [is] required to admit the document in evidence . . . ." (*People v. Morris* (1991) 53 Cal.3d 152, 205, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) The fact that " 'conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*People v. Valdez, supra,* 201 Cal.App.4th at p. 1435, quoting *Jazayeri v. Mao, supra,* 174 Cal.App.4th at p. 321.)

With respect to alteration, section 1402 states, "The party producing a writing as genuine which has been altered, or appears to have been altered, after its execution, in a part material to the question in dispute, must account for the alteration or appearance thereof. He may show that the alteration was made by another, without his concurrence, or was made with the consent of the parties affected by it, or otherwise properly or innocently made, or that the alteration did not change the meaning or language of the instrument. If he does that, he may give the writing in evidence, but not otherwise." (§ 1402.) Under section 1402, the test of materiality of an alteration is "whether it

21

changes the rights or duties of the parties, or either of them." (*Consolidated Loan Co. v. Harman* (1957) 150 Cal.App.2d 488, 491.)

We review a ruling on authentication matters for an abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1014.)

### b. *Anderson's contention.*

Anderson contends defense counsel knew or should have known the People would have difficulty authenticating the recording of the library confrontation based on his consistent claim the conversation began with Y saying, "You ruined my life," which is not included in the recording, and the failure of the Sheriff's Department to memorialize the original data in the manner prescribed by the manufacturer. Also, had defense counsel consulted other experts as Russ assertedly recommended, the defense could have shown the vocal anomalies uncovered by the habeas experts which cast doubt on the integrity of the recording and constitute strong evidence the recording was altered. Anderson claims a timely challenge would have resulted in exclusion of the recording or admission of the recording with evidence calling its authenticity into question and an instruction directing the jury to determine its authenticity before considering it. According to Anderson, either result undermined the prosecution's case and supports a finding of prejudice.

### c. *Y.'s testimony, corroborated by Ebert's testimony, was sufficient to authenticate the recording.*

Before the grand jury, the prosecutor asked Y. to listen to the recording because "I am going to ask you afterwards . . . if this is the complete conversation between both of you." After playing the recording, the prosecutor asked if "that was an accurate tape of the conversation," and Y. responded, "Yes."

When a knowledgeable witness testifies a writing or recording is accurate, the trial court is "amply justified in rejecting defendant's view that the copy was altered or incomplete." (*People v. Morris, supra,* 53 Cal.3d at p. 205 [trial court properly rejected authentication objection where defendant claimed a page of his letter was missing and handwriting expert suggested possibility of a missing page, but recipient testified letter

22

was accurate]; *People v. Bowley, supra*, 59 Cal.2d at p. 862.)  Similarly, at trial Y. testified she had the recorder in her purse when she met Anderson at the library and the recording was an accurate rendition of their conversation.

Defense counsel would have been familiar with the grand jury proceedings and thus would have been aware of Y.'s ability to authenticate the recording of the library confrontation.  Because an authentication challenge to the library recording would have failed, the decision not to bring a futile motion was a reasonable strategic choice. (See *People v. Prieto* (2003) 30 Cal.4th 226, 261 ["counsel's decision to forgo implausible arguments or objections does not constitute deficient performance"]; *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091 [counsel is not required to make futile motions to appear competent].)

Y.'s testimony was corroborated by Detective Ebert's testimony in the trial court and by declaration here.  Ebert explained the procedure by which he transferred the original digital data to a computer in proprietary format and thereafter placed copies of the proprietary file on CD's provided to the defense.  Ebert declared he "never altered, manipulated, or edited any file without documenting" the editing process.  Given Ebert's testimony, any material alteration to the recording, other than the documented enhancements performed on the recording, must have been innocently made.

Anderson argues the Grigoras declaration demonstrates alteration of the recording was not innocent.  Grigoras declared that, in order to edit the recording so as to eliminate the blank blocks where erasures had occurred, the original recording would have to be removed from the recording device, converted to a .wav file which would have been edited and then re-recorded onto the device in the edited form.  Such a course of conduct would have required a concerted effort on behalf of law enforcement and simply is not plausible.  (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992 [affirming denial of motion for discovery of police personnel records finding defendant's "grandiose" allegations of a police conspiracy to frame him were not plausible].)

23

Based on the foregoing, we confidently conclude the recording of the library confrontation would have survived an authentication challenge. As previously noted, the time disparity and the awkward nature of the start of the conversation do not indicate portions of the recording had not been recorded. They similarly do not indicate the recording had been altered.

Russ's most recent declaration states he "suggested" Sahu "consider having the recording examined by an expert with more specialized background in digital recording issues." Russ does not indicate when he made this suggestion and the suggestion does not appear in Russ's letter to counsel dated July 14, 2006.

In any event, even had defense counsel raised the anomalies noted by the habeas experts, the absence of a screen-shot of the initial transfer from the recorder to the computer, and the time discrepancy in the Properties window of the file provided to the defense, these matters would have gone to the weight of the evidence, not its admissibility. (See *People v. Martinez* (2000) 22 Cal.4th 106, 128 ["[A]n objection that a [computerized] record is 'incomplete' generally 'go[es] to the weight of th[e] evidence and not its admissibility' "]; *Jazayeri v. Mao*, *supra*, 174 Cal.App.4th at p. 321.)

Assuming the science Anderson's experts rely upon, such as speech prosody, would have been admissible in court (see *People v. Kelly* (1976) 17 Cal.3d 24, 30, abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848), the anomalies found by Anderson's habeas experts fail to inspire any confidence in a reasonable probability of a different result. Two three-second jumps identified by the recorder's manufacturer due to memory block failure likely would provide an innocent explanation for at least some of the anomalies detected by the experts. In any event, the declarations of the habeas experts would not have overcome Y.'s testimony the conversation was accurately recorded and Detective Ebert's testimony about how the recording was transferred from the recording device to a computer in proprietary format.

24

Further, under section 1402, the prosecution only would have been required to explain any real or apparent alteration that was "material to the question in dispute." (§ 1402; *People v. Hovarter*, *supra*, 44 Cal.4th at p. 1014.) The asserted omission of "You ruined my life,"[8] was entirely consistent with the rest of the recorded conversation and thus not material to any question in dispute. Also, Anderson has failed to show the recording was altered "after its execution," as opposed to omitting a portion of the conversation. (§ 1402; see *People v. Hovarter*, *supra*, at p. 1014 [defendant challenged authentication of document on which handwritten markings may not have existed on the originals].) Because there was no indication the recording had been materially altered, there was no "genuine dispute . . . concerning material terms." (§ 1521, subd. (a)(1).) Nor was there any showing that "justice require[d] the exclusion" of the recording or that admission of secondary evidence of its content would be unfair. (§ 1521, subd. (a)(1) & (2).) Consequently, even if the CDs did not qualify as originals, they were admissible secondary evidence.

Anderson also invokes section 412, which provides, "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." Because the record indicates the defense had a digital copy of the recording in proprietary format, section 412 has no application.

In sum, the new declarations do not support a finding of a material alteration of the recording or contradict Anderson's admissions in the recorded conversation.

Further, it appears defense counsel acted reasonably in seeking to obtain the recording device and, when the trial court upheld the claim of official information privilege, seeking sanctions under section 1040. The Russ declaration filed under seal in

---

[8]     We are, at this point, only considering the asserted omission of the four words, "You ruined my life." We have, *ante*, already rejected as incredible Anderson's claim his conversation with Y. began with Y. specifically accusing him of sexual molestation and Anderson's denying it.

25

the trial court indicated detection of any manipulation of the recording required access to the original recording, microphone, recording device and "all the equipment and/or software used to process or store the recording after it was reduced to an original format." Russ told defense counsel he could not do a meaningful analysis without the original recording or recorder, the recordings he had "seem[ed] to be normal," and alterations in digital recordings were difficult to detect. Based on this advice, defense counsel reasonably focused on obtaining access to the recording equipment used to record the conversation as well as the original recording. (See *People v. Williams* (1988) 44 Cal.3d 883, 945-946; *Fields v. Brown* (9th Cir. 2005) 431 F.3d 1186, 1205.)

Indeed, habeas expert Grigoras reiterated the need for the recording equipment and declared that, in order to determine the feasibility of an intentional alteration of the recording, he had to examine the recording device. Thus, defense counsel cannot be seen to have acted unreasonably in seeking to obtain the equipment used to make the recording.

The absence of any indication defense counsel considered an authentication challenge to the recording of the library confrontation in defense counsel's files or billing records does not show defense counsel failed to consider such a challenge or misunderstood the burden of proof in an authentication proceeding. Defense counsel objected to the introduction of other evidence, such as Y.'s e-mails to Anderson, on authentication grounds. The trial court overruled the objection and admitted many e-mails into evidence, even where Y.'s testimony was the only evidence supporting the claim the e-mails had been sent. Thus, the record demonstrates defense counsel was aware of the availability of an authentication challenge.

Further, Anderson's claim Y. started the conversation by saying, "You ruined by life," carried with it substantial negative implications for Anderson. Had Anderson made this claim at trial, it would have prompted the prosecution to cross-examine Anderson with respect to his repeated insistence the meeting lasted only three minutes. This would have permitted the prosecution to argue Anderson's attempt to dismiss the conversation as a brief encounter demonstrated consciousness of guilt. Thus, defense counsel

reasonably could conclude Y.'s asserted statement, "You ruined my life," was unnecessary to Anderson's defense and, in fact, harmed his case. Such a tactical decision was well within the wide range of reasonable professional assistance. (*Strickland v. Washington, supra,* 466 U.S. at p. 689.)

3. *Failure to protect Anderson's right to testify fully and credibly in his own defense*.

During the recorded conversation, Y. complained she had experienced difficulty with interpersonal relationships, showed Anderson cuts on her arms and demanded an explanation. Anderson eventually said, "I'm sorry, [Y.]"

Anderson contends defense counsel should have asked the trial court to permit Anderson to testify Y.'s sexual orientation caused her self-destructive behavior and difficulty with relationships. However, the trial court sustained relevance objections whenever defense counsel attempted to elicit this information. During cross-examination of Y.'s friend, the trial court sustained a relevance objection when defense counsel asked if she and Y. were "girlfriend and girlfriend."

At the close of Y.'s trial testimony, defense counsel asked that Y. remain on call, noting the prosecutor intended to elicit the opinion of an expert "that cutting and burning is [a] symptom of sexual molestation . . . ." Defense counsel argued such behavior can also be caused by sexual identity issues and offered to demonstrate Y. "is gay and therefore had these problems which an expert will testify are reasons for cutting and burning."

The trial court ruled both sides could ask the experts about factors that could cause someone to cut or burn themselves and could inquire "regarding specific factors like anxiety and depression, and physical abuse, and sexual abuse, and issues regarding sexual orientation or sexual dysfunction as precipitating cutting and burning . . . . [¶] But to specifically make direct comments upon the sexuality, sexual orientation of a nine, ten, 12, eleven, 13-year-old, or 14-year-old" would be precluded under section 352. The trial court also noted the issue was disputed and collateral and would "engender even more delays in this case . . . ."

27

Defense counsel argued the expert testimony would have no meaning if the defense could not also present evidence indicating Y. is gay. The trial court indicated it would allow the inquiry if it "relate[d] to substantive issues in this case," but no such showing had been made.

Thereafter, defense counsel elicited Anderson's testimony he "knew the reasons for the cutting. Well, I assume the reasons for the cutting." However, defense counsel did not ask Anderson what those reasons were, hoping the prosecutor would cross-examine Anderson on this point, thereby opening the door to the evidence. Anderson claims defense counsel should have asked the trial court to revisit its ruling. He argues his knowledge of Y.'s sexual orientation was essential to explain his conduct during the library conversation and thus related to a substantive issue in the case. He notes defense counsel argued to the jury there was an explanation for Y.'s difficulties but it was not in the record because no one asked Anderson about it. Anderson asserts the jury must have viewed this as bizarre, given that defense counsel conducted extensive examination of Anderson.

However, the jury likely concluded defense counsel would have asked Anderson the source of Y.'s difficulty had the trial court permitted the inquiry. In any event, defense counsel reasonably could conclude the trial court would not change its ruling merely because Anderson believed Y.'s sexual orientation was the cause of her destructive behavior. (*People v. Prieto*, *supra*, 30 Cal.4th at p. 261.)

Further, the defense presented evidence indicating Y. had been the victim of physical abuse at the hands of her father in 1998 which resulted in a referral to the Department of Children and Family Services. Thus, even without the sexual identity evidence, the defense suggested explanations for Y.'s destructive behavior other than sexual molestation. No ineffective assistance of counsel appears.

28

## DISPOSITION

The petition is denied.  The order to show cause is discharged.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


CROSKEY, J.


KITCHING, J.

29